# RUFO, SHERIFF OF SUFFOLK COUNTY, ET AL. *v.* INMATES OF SUFFOLK COUNTY JAIL ET AL.

No. 90–954.   Argued October 9, 1991—Decided January 15, 1992*

---

*Together with No. 90–1004, *Rapone, Commissioner of Correction of Massachusetts* v. *Inmates of Suffolk County Jail et al.,* also on certiorari to the same court.

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and SCALIA, KENNEDY, and SOUTER, JJ., joined. O'CONNOR, J., filed an opinion concurring in the judgment, *post*, p. 393. STEVENS, J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post*, p. 399. THOMAS, J., took no part in the consideration or decision of the cases.

*Chester A. Janiak* argued the cause for petitioners in No. 90–954. With him on the briefs were *Thomas D. Burns, Peter J. Schneider, Ann E. Merryfield,* and *Robert C. Rufo, pro se. John T. Montgomery,* First Assistant Attorney General of Massachusetts, argued the cause for petitioner in No. 90–1004. With him on the briefs were *Scott Harshbarger,* Attorney General, and *Jon Laramore, Thomas A. Barnico,* and *Douglas H. Wilkins,* Assistant Attorneys General.

*Max D. Stern* argued the cause for respondents in both cases. With him on the brief were *Lynn Weissberg* and *Alan B. Morrison.*†

†Briefs of *amici curiae* urging reversal were filed for the State of New York by *Robert Abrams,* Attorney General, *O. Peter Sherwood,* Solicitor General, *Lawrence S. Kahn,* Deputy Solicitor General, and *Barbara B. Butler,* Assistant Attorney General; for the State of Tennessee et al. by *Charles W. Burson,* Attorney General of Tennessee, *Michael W. Catalano,* Deputy Attorney General, *Joel I. Klein, Paul M. Smith,* and *Richard G.*

JUSTICE WHITE delivered the opinion of the Court.

In these cases, the District Court denied a motion of the sheriff of Suffolk County, Massachusetts, to modify a consent

*Taranto, Charles Cole*, Attorney General of Alaska, *Grant Woods*, Attorney General of Arizona, *Winston Bryant*, Attorney General of Arkansas, *Dan Lungren*, Attorney General of California, *Gale Norton*, Attorney General of Colorado, *Charles M. Oberly III*, Attorney General of Delaware, *Robert A. Butterworth*, Attorney General of Florida, *Michael J. Bowers*, Attorney General of Georgia, *Elizabeth Barrett-Anderson*, Attorney General of Guam, *Warren Price III*, Attorney General of Hawaii, *Larry EchoHawk*, Attorney General of Idaho, *Roland W. Burris*, Attorney General of Illinois, *Linley E. Pearson*, Attorney General of Indiana, *Bonnie Campbell*, Attorney General of Iowa, *Robert T. Stephan*, Attorney General of Kansas, *Fred Cowan*, Attorney General of Kentucky, *William J. Guste, Jr.*, Attorney General of Louisiana, *Michael E. Carpenter*, Attorney General of Maine, *J. Joseph Curran, Jr.*, Attorney General of Maryland, *Frank J. Kelley*, Attorney General of Michigan, *Hubert H. Humphrey III*, Attorney General of Minnesota, *Mike Moore*, Attorney General of Mississippi, *William L. Webster*, Attorney General of Missouri, *Frankie Sue Del Papa*, Attorney General of Nevada, *John P. Arnold*, Attorney General of New Hampshire, *Robert J. Del Tufo*, Attorney General of New Jersey, *Tom Udall*, Attorney General of New Mexico, *Lacy H. Thornburg*, Attorney General of North Carolina, *Nicholas Spaeth*, Attorney General of North Dakota, *Lee Fisher*, Attorney General of Ohio, *Robert H. Henry*, Attorney General of Oklahoma, *Dave Frohnmayer*, Attorney General of Oregon, *Ernest D. Preate, Jr.*, Attorney General of Pennsylvania, *Hector Rivera-Cruz*, Attorney General of Puerto Rico, *James E. O'Neil*, Attorney General of Rhode Island, *T. Travis Medlock*, Attorney General of South Carolina, *Mark "Barney" Barnett*, Attorney General of South Dakota, *Paul Van Dam*, Attorney General of Utah, *Jeffrey L. Amestoy*, Attorney General of Vermont, *Rosalie Ballentine*, Acting Attorney General of the Virgin Islands, *Mary Sue Terry*, Attorney General of Virginia, *Ken Eikenberry*, Attorney General of Washington, *Mario Palumbo*, Attorney General of West Virginia, and *Joseph B. Meyer*, Attorney General of Wyoming; for the City of New York by *Victor A. Kovner, Leonard J. Koerner, Fay Leoussis*, and *Timothy J. O'Shaughnessy;* for the International City Management Association et al. by *Richard Ruda, Zachary D. Fasman*, and *Mark L. Gerchick;* and for Michael J. Ashe, Jr., Sheriff of Hampden County, et al. by *Edward J. McDonough, Jr.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *John A. Powell, Steven R. Shapiro, John*

decree entered to correct unconstitutional conditions at the Suffolk County Jail. The Court of Appeals affirmed. The issue before us is whether the courts below applied the correct standard in denying the motion. We hold that they did not and remand these cases for further proceedings.

## I

This litigation began in 1971 when inmates sued the Suffolk County sheriff, the Commissioner of Correction for the State of Massachusetts, the mayor of Boston, and nine city councilors, claiming that inmates not yet convicted of the crimes charged against them were being held under unconstitutional conditions at what was then the Suffolk County Jail. The facility, known as the Charles Street Jail, had been constructed in 1848 with large tiers of barred cells. The numerous deficiencies of the jail, which had been treated with what a state court described as "malignant neglect," *Attorney General* v. *Sheriff of Suffolk County*, 394 Mass. 624, 625, 477 N. E. 2d 361, 362 (1985), are documented in the decision of the District Court. See *Inmates of Suffolk County Jail* v. *Eisenstadt*, 360 F. Supp. 676, 679–684 (Mass. 1973). The court held that conditions at the jail were constitutionally deficient:

> "As a facility for the pretrial detention of presumptively innocent citizens, Charles Street Jail unnecessarily and unreasonably infringes upon their most basic liberties, among them the rights to reasonable freedom of

*Reinstein, Elizabeth Alexander, Alexa P. Freeman,* and *Alvin J. Bronstein;* for the Center for Dispute Settlement by *C. Lani Guinier;* for the Inmates of the Lorton Central Facility by *Peter J. Nickles, Bruce N. Kuhlik,* and *Alan A. Pemberton;* for the Lawyers' Committee for Civil Rights Under Law of the Boston Bar Association by *John C. Englander;* and for Allen F. Breed et al. by *Sheldon Krantz.*

*Solicitor General Starr, Assistant Attorney General Gerson, Deputy Solicitor General Shapiro, Harriet S. Shapiro, Robert E. Kopp,* and *Thomas M. Bondy* filed a brief for the United States as *amicus curiae.*

motion, personal cleanliness, and personal privacy. The court finds and rules that the quality of incarceration at Charles Street is 'punishment' of such a nature and degree that it cannot be justified by the state's interest in holding defendants for trial; and therefore it violates the due process clause of the Fourteenth Amendment." *Id.,* at 686.[1]

The court permanently enjoined the government defendants: "(a) from housing at the Charles Street Jail after November 30, 1973 in a cell with another inmate, any inmate who is awaiting trial and (b) from housing at the Charles Street Jail after June 30, 1976 any inmate who is awaiting trial." *Id.,* at 691. The defendants did not appeal.[2]

In 1977, with the problems of the Charles Street Jail still unresolved, the District Court ordered defendants, including the Boston City Council, to take such steps and expend the funds reasonably necessary to renovate another existing facility as a substitute detention center. *Inmates of Suffolk County Jail* v. *Kearney,* Civ. Action No. 71–162–G (Mass.,

---

[1] The court was of the view that cases dealing with pretrial detention are more appropriately analyzed under the Due Process Clause of the Fourteenth Amendment than under the Cruel and Unusual Punishments Clause of the Eighth Amendment, but thought that conditions at the Charles Street Jail were also vulnerable under the Eighth Amendment. *Inmates of Suffolk County Jail* v. *Eisenstadt,* 360 F. Supp., at 688.

[2] However, within five months, Suffolk County officials advised the court that they could not comply with the November 30 deadline for ending double celling at the Charles Street Jail. The District Court ordered the commissioner to transfer inmates to other institutions, and the commissioner appealed, claiming that the court lacked the power to order him to make the transfers. The First Circuit affirmed the order of the District Court, finding that the commissioner had "major statutory responsibilities" over county jails and that he had failed to appeal the District Court's decision holding that he was a proper party to the lawsuit. *Inmates of Suffolk County Jail* v. *Eisenstadt,* 494 F. 2d 1196, cert. denied, 419 U. S. 977 (1974).

June 30, 1977), App. 22. The Court of Appeals agreed that immediate action was required:

> "It is now just short of five years since the district court's opinion was issued. For all of that time the plaintiff class has been confined under the conditions repugnant to the constitution. For all of that time defendants have been aware of that fact.

> .        .        .        .        .

> "Given the present state of the record and the unconscionable delay that plaintiffs have already endured in securing their constitutional rights, we have no alternative but to affirm the district court's order to prohibit the incarceration of pretrial detainees at the Charles St. Jail." *Inmates of Suffolk County Jail* v. *Kearney*, 573 F. 2d 98, 99–100 (CA1 1978).

The Court of Appeals ordered that the Charles Street Jail be closed on October 2, 1978, unless a plan was presented to create a constitutionally adequate facility for pretrial detainees in Suffolk County.

Four days before the deadline, the plan that formed the basis for the consent decree now before this Court was submitted to the District Court. Although plans for the new jail were not complete, the District Court observed that "the critical features of confinement, such as single cells of 80 sq. ft. for inmates, are fixed and safety, security, medical, recreational, kitchen, laundry, educational, religious and visiting provisions, are included. There are unequivocal commitments to conditions of confinement which will meet constitutional standards." *Inmates of Suffolk County Jail* v. *Kearney*, Civ. Action No. 71–162–G (Mass., Oct. 2, 1978), App. 51, 55. The court therefore allowed Suffolk County to continue housing its pretrial detainees at the Charles Street Jail.

Seven months later, the court entered a formal consent decree in which the government defendants expressed their "desire . . . to provide, maintain and operate as applicable a

suitable and constitutional jail for Suffolk County pretrial detainees." *Inmates of Suffolk County Jail* v. *Kearney,* Civ. Action No. 71–162–G (Mass., May 7, 1979), App. to Pet. for Cert. in No. 90–954, p. 15a. The decree specifically incorporated the provisions of the Suffolk County Detention Center, Charles Street Facility, Architectural Program, which— in the words of the consent decree—"sets forth a program which is both constitutionally adequate and constitutionally required." *Id.,* at 16a.

Under the terms of the architectural program, the new jail was designed to include a total of 309 "[s]ingle occupancy rooms" of 70 square feet, App. 73, 76,[3] arranged in modular units that included a kitchenette and recreation area, inmate laundry room, education units, and indoor and outdoor exercise areas. See, *e. g., id.,* at 249. The size of the jail was based on a projected decline in inmate population, from 245 male prisoners in 1979 to 226 at present. *Id.,* at 69.

Although the architectural program projected that construction of the new jail would be completed by 1983, *ibid.,* work on the new facility had not been started by 1984. During the intervening years, the inmate population outpaced population projections. Litigation in the state courts ensued, and defendants were ordered to build a larger jail. *Attorney General* v. *Sheriff of Suffolk County,* 394 Mass. 624,

---

[3] The size of the cells was reduced from the September plan. The architectural program noted that:

"The single occupancy rooms have been sized to meet the minimum standards as devised by the following standard setting agencies. The Massachusetts Department of Correction's *Code of Human Services Regulations,* Chapter IX—Standards for County Correctional Facilities, Standard 972.3 calls for a minimum of 70 square feet for all new cell design. The *Manual of Standards for Adult Local Detention Facilities,* Standard 5103, as sponsored by the American Correctional Association requires at least 70 sq. ft. of floor space when confinement exceeds 10 hours per day." App. 77–78.

See also *id.,* at 63–66 (listing state and national standards consulted in preparation of the architectural program).

477 N. E. 2d 361 (1985). Thereupon, plaintiff prisoners, with the support of the sheriff, moved the District Court to modify the decree to provide a facility with 435 cells. Citing "the unanticipated increase in jail population and the delay in completing the jail," the District Court modified the decree to permit the capacity of the new jail to be increased in any amount, provided that:

> "(a) single-cell occupancy is maintained under the design for the facility;
>
> "(b) under the standards and specifications of the Architectural Program, as modified, the relative proportion of cell space to support services will remain the same as it was in the Architectural Program;
>
> "(c) any modifications are incorporated into new architectural plans;
>
> "(d) defendants act without delay and take all steps reasonably necessary to carry out the provisions of the Consent Decree according to the authorized schedule." *Inmates of Suffolk County Jail* v. *Kearney,* Civ. Action No. 71–162–G (Mass., Apr. 11, 1985), App. 110, 111.

The number of cells was later increased to 453. Construction started in 1987.

In July 1989, while the new jail was still under construction, the sheriff moved to modify the consent decree to allow the double bunking of male detainees in 197 cells, thereby raising the capacity of the new jail to 610 male detainees. The sheriff argued that changes in law and in fact required the modification. The asserted change in law was this Court's 1979 decision in *Bell* v. *Wolfish,* 441 U. S. 520 (1979), handed down one week after the consent decree was approved by the District Court. The asserted change in fact was the increase in the population of pretrial detainees.

The District Court refused to grant the requested modification, holding that the sheriff had failed to meet the standard of *United States* v. *Swift & Co.,* 286 U. S. 106, 119 (1932):

"Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned."

The court rejected the argument that *Bell* required modification of the decree because the decision "did not directly overrule any legal interpretation on which the 1979 consent decree was based, and in these circumstances it is inappropriate to invoke Rule 60(b)(5) to modify a consent decree." *Inmates of Suffolk County Jail* v. *Kearney,* 734 F. Supp. 561, 564 (Mass. 1990). The court refused to order modification because of the increased pretrial detainee population, finding that the problem was "neither new nor unforeseen." *Ibid.*

The District Court briefly stated that, even under the flexible modification standard adopted by other Courts of Appeals,[4] the sheriff would not be entitled to relief because "[a] separate cell for each detainee has always been an important element of the relief sought in this litigation—perhaps even the most important element." *Id.,* at 565. Finally, the court rejected the argument that the decree should be modified because the proposal complied with constitutional standards, reasoning that such a rule "would undermine and discourage settlement efforts in institutional cases." *Ibid.* The District Court never decided whether the sheriff's proposal for double celling at the new jail would be constitutionally permissible.

The new Suffolk County Jail opened shortly thereafter.

The Court of Appeals affirmed, stating: "[W]e are in agreement with the well-reasoned opinion of the district court and see no reason to elaborate further." *Inmates of*

---

[4] See, *e. g., New York State Assn. for Retarded Children, Inc.* v. *Carey,* 706 F. 2d 956 (CA2) (Friendly, J.), cert. denied, 464 U. S. 915 (1983); *Philadelphia Welfare Rights Organization* v. *Shapp,* 602 F. 2d 1114 (CA3 1979), cert. denied, 444 U. S. 1026 (1980); *Plyler* v. *Evatt,* 846 F. 2d 208 (CA4), cert. denied, 488 U. S. 897 (1988); *Heath* v. *De Courcy,* 888 F. 2d 1105 (CA6 1989); *Newman* v. *Graddick,* 740 F. 2d 1513 (CA11 1984).

*Suffolk County Jail* v. *Kearney,* No. 90–1440 (CA1, Sept. 20, 1990), judgt. order reported at 915 F. 2d 1557, App. to Pet. for Cert. in No. 90–954, p. 2a.[5] We granted certiorari. 498 U. S. 1081 (1991).

## II

In moving for modification of the decree, the sheriff relied on Federal Rule of Civil Procedure 60(b), which in relevant part provides:

> "On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: . . . (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. . . ."

There is no suggestion in these cases that a consent decree is not subject to Rule 60(b). A consent decree no doubt embodies an agreement of the parties and thus in some respects is contractual in nature. But it is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees. *Railway Employes* v. *Wright,* 364 U. S. 642, 650–651 (1961). The District Court recognized as much but held that Rule 60(b)(5) codified the "grievous wrong" standard of *United States* v. *Swift & Co., supra,* that a case for modification under this standard

---

[5] Because of the overcrowding at the new Suffolk County Jail, the sheriff refused to transfer female prisoners to the new facility. He did not request modification of the decree. The District Court subsequently ordered the sheriff to house female inmates at the new jail. The sheriff appealed, and the First Circuit affirmed. *Inmates of Suffolk County Jail* v. *Kearney,* 928 F. 2d 33 (1991). That decision is not before this Court.

had not been made, and that resort to Rule 60(b)(6) was also unavailing. This construction of Rule 60(b) was error.

*Swift* was the product of a prolonged antitrust battle between the Government and the meat-packing industry. In 1920, the defendants agreed to a consent decree that enjoined them from manipulating the meat-packing industry and banned them from engaging in the manufacture, sale, or transportation of other foodstuffs. 286 U. S., at 111. In 1930, several meat-packers petitioned for modification of the decree, arguing that conditions in the meat-packing and grocery industries had changed. *Id.,* at 113. The Court rejected their claim, finding that the meat-packers were positioned to manipulate transportation costs and fix grocery prices in 1930, just as they had been in 1920. *Id.,* at 115–116. It was in this context that Justice Cardozo, for the Court, set forth the much-quoted *Swift* standard, requiring "[n]othing less than a clear showing of grievous wrong evoked by new and unforeseen conditions" . . . as a predicate to modification of the meat-packers' consent decree. *Id.,* at 119.

Read out of context, this language suggests a "hardening" of the traditional flexible standard for modification of consent decrees. *New York State Assn. for Retarded Children, Inc.* v. *Carey,* 706 F. 2d 956, 968 (CA2), cert. denied, 464 U. S. 915 (1983). But that conclusion does not follow when the standard is read in context. See *United States* v. *United Shoe Machinery Corp.,* 391 U. S. 244, 248 (1968). The *Swift* opinion pointedly distinguished the facts of that case from one in which genuine changes required modification of a consent decree, stating:

> "The distinction is between restraints that give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and are thus provisional and tentative. . . . The consent is to be read as directed toward events as they then were. It was not an abandonment of the

right to exact revision in the future, if revision should become necessary in adaptation to events to be." 286 U. S., at 114–115.

Our decisions since *Swift* reinforce the conclusion that the "grievous wrong" language of *Swift* was not intended to take on a talismanic quality, warding off virtually all efforts to modify consent decrees. *Railway Employes* emphasized the need for flexibility in administering consent decrees, stating: "There is . . . no dispute but that a sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen." 364 U. S., at 647.

The same theme was repeated in our decision last Term in *Board of Ed. of Oklahoma City Public Schools* v. *Dowell*, 498 U. S. 237, 246–248 (1991), in which we rejected the rigid use of the *Swift* "grievous wrong" language as a barrier to a motion to dissolve a desegregation decree.

There is thus little basis for concluding that Rule 60(b) misread the *Swift* opinion and intended that modifications of consent decrees in all cases were to be governed by the standard actually applied in *Swift*. That Rule, in providing that, on such terms as are just, a party may be relieved from a final judgment or decree where it is no longer equitable that the judgment have prospective application, permits a less stringent, more flexible standard.

The upsurge in institutional reform litigation since *Brown* v. *Board of Education*, 347 U. S. 483 (1954), has made the ability of a district court to modify a decree in response to changed circumstances all the more important. Because such decrees often remain in place for extended periods of time, the likelihood of significant changes occurring during the life of the decree is increased. See, *e. g., Philadelphia Welfare Rights Organization* v. *Shapp*, 602 F. 2d 1114, 1119–1121 (CA3 1979), cert. denied, 444 U. S. 1026 (1980), in which modification of a consent decree was allowed in light of

changes in circumstances that were beyond the defendants' control and were not contemplated by the court or the parties when the decree was entered.

The experience of the District Courts and Courts of Appeals in implementing and modifying such decrees has demonstrated that a flexible approach is often essential to achieving the goals of reform litigation.  See, *e. g., New York State Assn. for Retarded Children, Inc.* v. *Carey, supra.*[6]  The Courts of Appeals have also observed that the public interest is a particularly significant reason for applying a flexible modification standard in institutional reform litigation because such decrees "reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions."  *Heath* v. *De Courcy,* 888 F. 2d 1105, 1109 (CA6 1989).  Accord, *New York State Assn. for Retarded Children, Inc.* v. *Carey, supra,* at 969.

---

[6] In *Carey,* the state defendants sought modification of a consent decree designed to empty a state school for the mentally retarded that had housed over 6,000 people in squalid conditions.  The consent judgment contemplated transfer of residents to community placements of 15 or fewer beds.  706 F. 2d, at 959.  Defendants urged that revising the decree to allow placement of some residents in larger community residences would both expedite their transfer from the state school and allow for a higher quality of care.  Judge Friendly, writing for the Second Circuit, allowed the modification:

"Here, as in *Swift,* the modification is proposed by the defendants.  But it is not, as in *Swift,* in derogation of the primary objective of the decree, namely, to empty such a mammoth institution . . . ; indeed defendants offered substantial evidence that, again in contrast to *Swift,* the modification was essential to attaining that goal at any reasonably early date.  To be sure, the change does run counter to another objective of the decree, namely, to place the occupants . . . in small facilities bearing some resemblance to a normal home, but any modification will perforce alter some aspect of the decree."  *Id.,* at 969.

In so ruling, the court recognized that "[t]he power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible."  *Id.,* at 967.

Petitioner Rufo urges that these factors are present in the cases before us and support modification of the decree. He asserts that modification would actually improve conditions for some pretrial detainees, who now cannot be housed in the Suffolk County Jail and therefore are transferred to other facilities, farther from family members and legal counsel. In these transfer facilities, petitioners assert that detainees may be double celled under less desirable conditions than those that would exist if double celling were allowed at the new Suffolk County Jail. Petitioner Rufo also contends that the public interest is implicated here because crowding at the new facility has necessitated the release of some pretrial detainees and the transfer of others to halfway houses, from which many escape.

For the District Court, these points were insufficient reason to modify under Rule 60(b)(5) because its "authority [was] limited by the established legal requirements for modification . . . ." 734 F. Supp., at 566. The District Court, as noted above, also held that the suggested modification would not be proper even under the more flexible standard that is followed in some other Circuits. None of the changed circumstances warranted modification because it would violate one of the primary purposes of the decree, which was to provide for "[a] separate cell for each detainee [which] has always been an important element of the relief sought in this litigation—perhaps even the most important element." *Id.*, at 565. For reasons appearing later in this opinion, this was not an adequate basis for denying the requested modification. The District Court also held that Rule 60(b)(6) provided no more basis for relief. The District Court, and the Court of Appeals as well, failed to recognize that such rigidity is neither required by *Swift* nor appropriate in the context of institutional reform litigation.

It is urged that any rule other than the *Swift* "grievous wrong" standard would deter parties to litigation such as this from negotiating settlements and hence destroy the util-

ity of consent decrees. Obviously that would not be the case insofar as the state or local government officials are concerned. As for the plaintiffs in such cases, they know that if they litigate to conclusion and win, the resulting judgment or decree will give them what is constitutionally adequate at that time but perhaps less than they hoped for. They also know that the prospective effect of such a judgment or decree will be open to modification where deemed equitable under Rule 60(b). Whether or not they bargain for more than what they might get after trial, they will be in no worse position if they settle and have the consent decree entered. At least they will avoid further litigation and perhaps will negotiate a decree providing more than what would have been ordered without the local government's consent. And, of course, if they litigate, they may lose.

### III

Although we hold that a district court should exercise flexibility in considering requests for modification of an institutional reform consent decree, it does not follow that a modification will be warranted in all circumstances. Rule 60(b)(5) provides that a party may obtain relief from a court order when "it is no longer equitable that the judgment should have prospective application," not when it is no longer convenient to live with the terms of a consent decree. Accordingly, a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree. If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance.[7]

---

[7] The standard we set forth applies when a party seeks modification of a term of a consent decree that arguably relates to the vindication of a constitutional right. Such a showing is not necessary to implement minor changes in extraneous details that may have been included in a decree (e. g., paint color or design of a building's facade) but are unrelated to

## A

A party seeking modification of a consent decree may meet its initial burden by showing a significant change either in factual conditions or in law.

### 1

Modification of a consent decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous. Such a modification was approved by the District Court in this litigation in 1985 when it became apparent that plans for the new jail did not provide sufficient cell space. *Inmates of Suffolk County Jail* v. *Kearney,* Civ. Action No. 71–162–G (Mass., Apr. 11, 1985), App. 110.[8] Modification is also appropriate when a decree proves to be unworkable because of unforeseen obstacles, *New York State Assn. for Retarded Children, Inc.* v. *Carey,* 706 F. 2d, at 969 (modification allowed where State could not find appropriate housing facilities for transfer patients); *Philadelphia Welfare Rights Organization* v. *Shapp,* 602 F. 2d, at 1120–1121 (modification allowed where State could not find sufficient clients to meet decree targets); or when enforcement of the decree without modification would be detrimental to the public interest, *Duran* v. *Elrod,* 760 F. 2d 756,

---

remedying the underlying constitutional violation. Ordinarily, the parties should consent to modifying a decree to allow such changes. If a party refuses to consent and the moving party has a reasonable basis for its request, the court should modify the decree. In these cases the entire architectural program became part of the decree binding on the local authorities. Hence, any change in the program technically required a change in the decree, absent a provision in the program exempting certain changes. Such a provision was furnished by the 1985 modification of the decree. Of course, the necessity of changing a decree to allow insignificant changes could be avoided by not entering an overly detailed decree.

[8] This modification was entered over the opposition of the Boston city councilors, who were parties to the litigation in the District Court.

759–761 (CA7 1985) (modification allowed to avoid pretrial release of accused violent felons).

Respondents urge that modification should be allowed only when a change in facts is both "unforeseen and unforeseeable." Brief for Respondents 35. Such a standard would provide even less flexibility than the exacting *Swift* test; we decline to adopt it. Litigants are not required to anticipate every exigency that could conceivably arise during the life of a consent decree.

Ordinarily, however, modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree. See *Twelve John Does* v. *District of Columbia*, 274 U. S. App. D. C. 62, 65–66, 861 F. 2d 295, 298–299 (1988); *Ruiz* v. *Lynaugh*, 811 F. 2d 856, 862–863 (CA5 1987). If it is clear that a party anticipated changing conditions that would make performance of the decree more onerous but nevertheless agreed to the decree, that party would have to satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b).

Accordingly, on remand the District Court should consider whether the upsurge in the Suffolk County inmate population was foreseen by petitioners. The District Court touched on this issue in April 1990, when, in the course of denying the modification requested in this litigation, the court stated that "the overcrowding problem faced by the Sheriff is neither new nor unforeseen. It has been an ongoing problem during the course of this litigation, before and after entry of the consent decree." 734 F. Supp., at 564. However, the architectural program incorporated in the decree in 1979 specifically set forth projections that the jail

population would decrease in subsequent years.[9] Significantly, when the District Court modified the consent decree in 1985, the court found that the "modifications are necessary to meet the *unanticipated increase* in jail population and the delay in completing the jail." *Inmates of Suffolk County Jail* v. *Kearney*, Civ. Action No. 71–162–G (Mass., Apr. 11, 1985), App. 110 (emphasis added). Petitioners assert that it was only in July 1988, 10 months after construction began, that the number of pretrial detainees exceeded 400 and began to approach the number of cells in the new jail. Brief for Petitioner Rufo in No. 90–954, p. 9.

It strikes us as somewhat strange, if a rapidly increasing jail population had been contemplated, that respondents would have settled for a new jail that would not have been adequate to house pretrial detainees.[10] There is no doubt

---

[9] The architectural program included the following projections:

| Year | Population Projections |
|------|------------------------|
| 1979 | 245 |
| 1980 | 243 |
| 1981 | 241 |
| 1982 | 239 |
| 1983 | 238 |
| 1984 | 236 |
| 1985–1989 | 232 |
| 1990–1994 | 226 |
| 1995–1999 | 216 |

App. 69.

[10] Respondents and the District Court have been provided with daily prison population data during this litigation. See Tr. 82 (Mar. 30, 1990). The fact that none of the parties showed alarm over fluctuations in these data undermines the dissent's argument that the ongoing population increase was "reasonably foreseeable." See *post*, at 406.

We note that the dissent's "reasonably foreseeable" standard differs significantly from that adopted by the Court today. By invoking this standard and focusing exclusively on developments following modification of the decree in 1985, see *post*, at 405, the dissent jumps to the conclusion that petitioners assumed full responsibility for responding to any increase in detainee numbers by increasing the capacity of the jail, potentially infinitely. But we do not think that, in the absence of a clear agreement and

that the decree, as originally issued and modified, called for
a facility with single cells. *Inmates of Suffolk County Jail*
v. *Kearney*, Civ. Action No. 71–162–G (Mass., Apr. 11, 1985),
App. 110.[11] It is apparent, however, that the decree itself
nowhere expressly orders or reflects an agreement by peti-
tioners to provide jail facilities having single cells sufficient
to accommodate all future pretrial detainees, however large
the number of such detainees might be. Petitioners' agree-
ment and the decree appear to have bound them only to pro-
vide the specified number of single cells. If petitioners were
to build a second new facility providing double cells that
would meet constitutional standards, it is doubtful that they
would have violated the consent decree.

Even if the decree is construed as an undertaking by peti-
tioners to provide single cells for pretrial detainees, to re-
lieve petitioners from that promise based on changed condi-
tions does not necessarily violate the basic purpose of the
decree. That purpose was to provide a remedy for what had
been found, based on a variety of factors, including double
celling, to be unconstitutional conditions obtaining in the
Charles Street Jail. If modification of one term of a consent
decree defeats the purpose of the decree, obviously modifi-
cation would be all but impossible. That cannot be the rule.
The District Court was thus in error in holding that even
under a more flexible standard than its version of *Swift* re-
quired, modification of the single cell requirement was neces-
sarily forbidden.

---

a fully developed record, this Court should impose that burden on a local
government by assuming that a change in circumstances was "reasonably
foreseeable" and that anticipating and responding to such a change was
the sole responsibility of petitioners.

[11] One of the conditions of the modification ordered in 1985 was that
"single-cell occupancy is maintained under the design for the facility."
App. 111.

2

A consent decree must of course be modified if, as it later turns out, one or more of the obligations placed upon the parties has become impermissible under federal law. But modification of a consent decree may be warranted when the statutory or decisional law has changed to make legal what the decree was designed to prevent.

This was the case in *Railway Employes* v. *Wright*, 364 U. S. 642 (1961). A railroad and its unions were sued for violating the Railway Labor Act, 45 U. S. C. § 151 *et seq.*, which banned discrimination against nonunion employees, and the parties entered a consent decree that prohibited such discrimination. Later, the Railway Labor Act was amended to allow union shops, and the union sought a modification of the decree. Although the amendment did not require, but purposely permitted, union shops, this Court held that the union was entitled to the modification because the parties had recognized correctly that what the consent decree prohibited was illegal under the Railway Labor Act as it then read and because a "court must be free to continue to further the objectives of th[e] Act when its provisions are amended." *Railway Employes, supra*, at 651. See also *Firefighters* v. *Stotts*, 467 U. S. 561, 576, and n. 9, 583, n. 17 (1984).

Petitioner Rapone urges that, without more, our 1979 decision in *Bell* v. *Wolfish*, 441 U. S. 520, was a change in law requiring modification of the decree governing construction of the Suffolk County Jail. We disagree. *Bell* made clear what the Court had not before announced: that double celling is not in all cases unconstitutional. But it surely did not cast doubt on the legality of single celling, and petitioners were undoubtedly aware that *Bell* was pending when they signed the decree. Thus, the case must be judged on the basis that it was immaterial to petitioners that double celling might be ruled constitutional, *i. e.*, they preferred even in that event to agree to a decree which called for providing only single cells in the jail to be built.

Neither *Bell* nor the Federal Constitution forbade this course of conduct. Federal courts may not order States or local governments, over their objection, to undertake a course of conduct not tailored to curing a constitutional violation that has been adjudicated. See *Milliken* v. *Bradley (Milliken II)*, 433 U. S. 267, 281 (1977). But we have no doubt that, to "save themselves the time, expense, and inevitable risk of litigation," *United States* v. *Armour & Co.*, 402 U. S. 673, 681 (1971), petitioners could settle the dispute over the proper remedy for the constitutional violations that had been found by undertaking to do more than the Constitution itself requires (almost any affirmative decree beyond a directive to obey the Constitution necessarily does that), but also more than what a court would have ordered absent the settlement. Accordingly, the District Court did not abuse its discretion in entering the agreed-upon decree, which clearly was related to the conditions found to offend the Constitution. *Milliken* v. *Bradley (Milliken I)*, 418 U. S. 717, 738 (1974). See also *Dowell*, 498 U. S., at 246–248. Cf. *Firefighters* v. *Cleveland*, 478 U. S. 501, 525 (1986).[12]

To hold that a clarification in the law automatically opens the door for relitigation of the merits of every affected consent decree would undermine the finality of such agreements and could serve as a disincentive to negotiation of settlements in institutional reform litigation. The position urged by petitioners

---

[12] Petitioner Rapone contends that the District Court was required to modify the consent decree because "the constitutional violation underlying the decree has disappeared and will not recur" and that "no constitutional violation [is] even alleged" at the new jail, "so there is no constitutional violation to serve as a predicate for the federal court's continued exercise of its equitable power." Brief for Petitioner in No. 90–1004, pp. 36–37. His argument is not well taken. The District Court did not make findings on these issues, and even if it had ruled that double celling at the new jail is constitutional and that the modification should be granted, we do not have before us the question whether the entire decree should be vacated.

"would necessarily imply that the only *legally enforce-able* obligation assumed by the state under the consent decree was that of ultimately achieving minimal constitutional prison standards. . . . Substantively, this would do violence to the obvious intention of the parties that the decretal obligations assumed by the state were not confined to meeting minimal constitutional requirements. Procedurally, it would make necessary, as this case illustrates, a constitutional decision every time an effort was made either to enforce or modify the decree by judicial action." *Plyler* v. *Evatt,* 924 F. 2d 1321, 1327 (CA4 1991).

While a decision that clarifies the law will not, in and of itself, provide a basis for modifying a decree, it could constitute a change in circumstances that would support modification if the parties had based their agreement on a misunderstanding of the governing law. For instance, in *Pasadena City Bd. of Ed.* v. *Spangler,* 427 U. S. 424, 437–438 (1976), we held that a modification should have been ordered when the parties had interpreted an ambiguous equitable decree in a manner contrary to the District Court's ultimate interpretation and the District Court's interpretation was contrary to intervening decisional law. And in *Nelson* v. *Collins,* 659 F. 2d 420, 428–429 (1981) (en banc), the Fourth Circuit vacated an equitable order that was based on the assumption that double bunking of prisoners was *per se* unconstitutional.

Thus, if the sheriff and commissioner could establish on remand that the parties to the consent decree believed that single celling of pretrial detainees was mandated by the Constitution, this misunderstanding of the law could form a basis for modification. In this connection, we note again, see *supra,* at 375, that the decree itself recited that it "sets forth a program which is both constitutionally adequate and constitutionally *required.*" (Emphasis added.)

B

Once a moving party has met its burden of establishing either a change in fact or in law warranting modification of a consent decree, the district court should determine whether the proposed modification is suitably tailored to the changed circumstance. In evaluating a proposed modification, three matters should be clear.

Of course, a modification must not create or perpetuate a constitutional violation. Petitioners contend that double celling inmates at the Suffolk County Jail would be constitutional under *Bell*. Respondents counter that *Bell* is factually distinguishable and that double celling at the new jail would violate the constitutional rights of pretrial detainees.[18] If this is the case—the District Court did not decide this issue, 734 F. Supp., at 565–566—modification should not be granted.

A proposed modification should not strive to rewrite a consent decree so that it conforms to the constitutional floor. Once a court has determined that changed circumstances warrant a modification in a consent decree, the focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances. A court should do no more, for a consent decree is a final judgment that may be reopened only to the extent that equity requires. The court should not "turn aside to inquire whether some of [the provisions of the decree] upon separate as distinguished from joint action could have been opposed

---

[18] In the District Court, respondents introduced the report of an architectural consultant who claimed that the proposed modification would violate the standards of the American Correctional Association and the Massachusetts Division of Capital Planning and Operations by leaving detainees with inadequate cell, dayroom, and outdoor exercise space. See App. 146–179. See *Bell*, 441 U. S., at 544, n. 27 ("[W]hile the recommendations of these various groups may be instructive in certain cases, they simply do not establish the constitutional minima").

with success if the defendants had offered opposition." *Swift*, 286 U. S., at 116–117.

Within these constraints, the public interest and "[c]onsiderations based on the allocation of powers within our federal system," *Dowell, supra,* at 248, require that the district court defer to local government administrators, who have the "primary responsibility for elucidating, assessing, and solving" the problems of institutional reform, to resolve the intricacies of implementing a decree modification. *Brown* v. *Board of Education,* 349 U. S. 294, 299 (1955). See also *Missouri* v. *Jenkins,* 495 U. S. 33, 50–52 (1990); *Milliken II,* 433 U. S., at 281.[14] Although state and local officers in charge of institutional litigation may agree to do more than that which is minimally required by the Constitution to settle a case and avoid further litigation, a court should surely keep the public interest in mind in ruling on a request to modify based on a change in conditions making it substantially more onerous to abide by the decree. To refuse modification of a decree is to bind all future officers of the State, regardless of their view of the necessity of relief from one or more provisions of a decree that might not have been entered had the matter been litigated to its conclusion. The District Court seemed to be of the view that the problems of the fiscal officers of the State were only marginally relevant to the request for modification in this case. 734 F. Supp., at 566. Financial constraints may not be used to justify the creation or perpetuation of constitutional violations, but they are a legitimate concern of government defendants in institu-

---

[14] The concurrence mischaracterizes the nature of the deference that we would accord local government administrators. As we have stated, see *supra,* at 383, the moving party bears the burden of establishing that a significant change in circumstances warrants modification of a consent decree. No deference is involved in this threshold inquiry. However, once a court has determined that a modification is warranted, we think that principles of federalism and simple common sense require the court to give significant weight to the views of the local government officials who must implement any modification.

tional reform litigation and therefore are appropriately considered in tailoring a consent decree modification.

## IV

To conclude, we hold that the *Swift* "grievous wrong" standard does not apply to requests to modify consent decrees stemming from institutional reform litigation. Under the flexible standard we adopt today, a party seeking modification of a consent decree must establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance. We vacate the decision below and remand the cases for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE THOMAS took no part in the consideration or decision of these cases.

JUSTICE O'CONNOR, concurring in the judgment.

I agree that these cases should be remanded so that the District Court may reconsider whether to modify the decree. I write separately to emphasize the limited nature of our review; to clarify why, despite our limited review, the cases should be returned to the District Court; and to explain my concerns with certain portions of the Court's opinion.

## I

A court may modify a final judgment, such as the judgment embodied in the consent decree at issue, where the court finds that "it is no longer equitable that the judgment should have prospective application." Fed. Rule Civ. Proc. 60(b)(5). Determining what is "equitable" is necessarily a task that entails substantial discretion, particularly in a case like this one, where the District Court must make complex decisions requiring the sensitive balancing of a host of fac-

tors. As a result, an appellate court should examine primarily the *method* in which the District Court exercises its discretion, not the substantive outcome the District Court reaches. If the District Court takes into account the relevant considerations (all of which are not likely to suggest the same result) and accommodates them in a reasonable way, then the District Court's judgment will not be an abuse of its discretion, regardless of whether an appellate court would have reached the same outcome in the first instance. Cf. *Lemon* v. *Kurtzman*, 411 U. S. 192, 200 (1973) ("In shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow").

Our deference to the District Court's exercise of its discretion is heightened where, as in this litigation, the District Court has effectively been overseeing a large public institution over a long period of time. Judge Keeton has been supervising the implementation of this decree since 1979; he has developed an understanding of the difficulties involved in constructing and managing a jail that an appellate court, even with the best possible briefing, could never hope to match. In reviewing the District Court's judgment, we accordingly owe substantial deference to "the trial judge's years of experience with the problem at hand." *Hutto* v. *Finney*, 437 U. S. 678, 688 (1978).

The Court devotes much of its attention to elaborating a "standard" for lower courts to apply in cases of this kind. *Ante*, at 378–384. I am not certain that the product of this effort—"A party seeking modification of a consent decree may meet its initial burden by showing a significant change either in factual conditions or in law," *ante*, at 384—makes matters any clearer than the equally general language of Rule 60(b)(5). I think we would offer more guidance to the District Court here, and to the many other courts burdened with administering complex decrees like this one, if we would simply review the District Court's exercise of its dis-

cretion and specify any shortcomings we might find in the method by which the court reached its conclusion.

## II

In my view, the District Court took too narrow a view of its own discretion. The court's reasoning, as expressed in its opinion, was flawed by three different errors of law, each of which excised a portion of the range of options available to the court. I believe the sum of these erroneously self-imposed limits constituted an abuse of the court's discretion.

First, the court relied on *United States* v. *Swift & Co.*, 286 U. S. 106, 119 (1932), to determine that "new and unforeseen conditions" were a prerequisite to any modification. *Inmates of Suffolk County Jail* v. *Kearney*, 734 F. Supp. 561, 563 (Mass. 1990). Because the court found that the overcrowding at the jail was foreseen, *id.*, at 564, the court viewed *Swift* as barring modification. As the Court explains today, *ante*, at 379–380, the District Court erred in this respect. That overcrowding was foreseen should not have been a dispositive factor in the court's decision. Modification could conceivably still be "equitable" under Rule 60(b)(5) even if the rise in inmate population had been foreseen; the danger to the community from the pretrial release of inmates, for example, might outweigh the petitioners' failure to accommodate even a foreseen increase in the inmate population.

Second, the District Court concluded that it lacked the authority to consider the petitioners' budget constraints in determining whether modification would be equitable. The court held: "It is not a legally supportable basis for modification of a consent decree that public officials having fiscal authority have chosen not to provide adequate resources for the Sheriff to comply with the terms of the consent decree." 734 F. Supp., at 566. Here again, I think the court took too narrow a view of its own authority. State and local governments are responsible for providing a wide range of services.

Public officials often operate within difficult fiscal constraints; every dollar spent for one purpose is a dollar that cannot be spent for something else. While the lack of resources can never excuse a failure to obey constitutional requirements, it *can* provide a basis for concluding that continued compliance with a decree obligation is no longer "equitable," if, for instance, the obligation turns out to be significantly more expensive than anyone anticipated.

Third, although the District Court purported to apply the "flexible standard" proposed by the petitioners, the court denied modification because "[t]he type of modification sought here would not comply with the overall purpose of the consent decree; it would set aside the obligations of that decree." *Id.*, at 565. Taken literally, this conclusion deprives the "flexible standard" of any meaning; every modification, by definition, will alter an obligation of a decree. The court may have meant no more than that the plaintiff class would never have agreed to a decree without single celling, but, taking the court at its word, it held the petitioners to a standard that would never permit modification of any decree. This was another instance where the District Court, in my view, erroneously found that it lacked the authority to grant the relief requested by the petitioners.

In these three respects, the District Court felt itself bound by constraints that in fact did not exist. We do not know whether, and to what extent, the court would have modified the decree had it not placed these limits on its own authority. I would accordingly remand these cases so that the District Court may exercise the full measure of its discretion.

In doing so, however, I would emphasize that we find fault only with the *method* by which the District Court reached its conclusion. The District Court may well have been justified, for the reasons suggested by JUSTICE STEVENS, in refusing to modify the decree, and the court is free, when fully exercising its discretion, to reach the same result on remand. This is a case with no satisfactory outcome. The new jail is

simply too small. Someone has to suffer, and it is not likely to be the government officials responsible for underestimating the inmate population and delaying the construction of the jail. Instead, it is likely to be either the inmates of Suffolk County, who will be double celled in an institution designed for single celling; the inmates in counties not yet subject to court supervision, who will be double celled with the inmates transferred from Suffolk County; or members of the public, who may be the victims of crimes committed by the inmates the county is forced to release in order to comply with the consent decree. The District Court has an extraordinarily difficult decision to make. We should not be inclined to second-guess the court's sound judgment in deciding who will bear this burden.

## III

The Court's opinion today removes what I see as the three barriers the District Court erroneously placed in its own path. *Ante,* at 379–380 (distinguishing *Swift*); *ante,* at 386–387 (explaining that the court applied an impossibly strict version of the petitioners' proposed "flexible standard"); *ante,* at 392–393 (permitting the court to consider the petitioners' fiscal constraints). But what the Court removes with one hand, it replaces with the other. Portions of the Court's opinion might be read to place new constraints on the District Court's discretion that are, in my view, just as misplaced as the ones with which the District Court fettered itself the first time.

Most significantly, the Court observes that the District Court recognized single celling as " 'the most important element' " of the decree. *Ante,* at 382 (quoting 734 F. Supp., at 565). But the Court decides that "this was not an adequate basis for denying the requested modification." *Ante,* at 382. This conclusion is unsupported by any authority. Instead, the Court offers its own reasoning: "If modification of one term of a consent decree defeats the purpose of the decree,

obviously modification would be all but impossible. That cannot be the rule." *Ante*, at 387.

This sweeping conclusion strikes me as both logically and legally erroneous. It may be that the modification of one term of a decree does not *always* defeat the purpose of the decree. See *supra*, at 396. But it hardly follows that the modification of a single term can *never* defeat the decree's purpose, especially if that term is "the most important element" of the decree. If, for instance, the District Court finds that the respondents would never have consented to the decree (and a decade of delay in obtaining relief) without a guarantee of single celling, I should think that the court would not abuse its discretion were it to conclude that modification to permit double celling would be inequitable. Similarly, were the court to find that the jail was constructed with small cells on the assumption that each cell would hold but one inmate, I doubt that the District Court would exceed its authority under Rule 60(b)(5) by concluding that it would be inequitable to double cell the respondents. To the extent the Court suggests otherwise, it limits the District Court's discretion in what I think is an unwarranted and ill-advised fashion.

The same is true of the Court's statement that the District Court should "defer to local government administrators . . . to resolve the intricacies of implementing a decree modification." *Ante*, at 392. To be sure, the courts should defer to prison administrators in resolving the day-to-day problems in managing a prison; these problems fall within the expertise of prison officials. See, *e. g.*, *Thornburgh* v. *Abbott*, 490 U. S. 401, 407–408 (1989). But I disagree with the notion that courts must defer to prison administrators in resolving whether and how to modify a consent decree. These questions may involve details of prison management, but at bottom they require a determination of what is "equitable" to all concerned. Deference to one of the parties to a lawsuit is usually not the surest path to equity; deference to these

particular petitioners, who do not have a model record of compliance with previous court orders in this case, is particularly unlikely to lead to an equitable result. The inmates have as much claim as the prison officials to an understanding of the equities. The District Court should be free to take the views of both sides into account, without being forced to grant more deference to one side than to the other.

JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins, dissenting.

Today the Court endorses the standard for modification of consent decrees articulated by Judge Friendly in *New York State Assn. for Retarded Children, Inc.* v. *Carey*, 706 F. 2d 956 (CA2), cert. denied, 464 U. S. 915 (1983). I agree with that endorsement, but under that standard I believe the findings of the District Court in this action require affirmance of its order refusing to modify this consent decree.[1]

## I

When a district court determines, after a contested trial, that a state institution is guilty of a serious and persistent violation of the Federal Constitution, it typically fashions a remedy that is more intrusive than a simple order directing the defendants to cease and desist from their illegal conduct. See *Swann* v. *Charlotte-Mecklenburg Bd. of Ed.*, 402 U. S. 1 (1971). A district court has a duty to command a remedy that is effective, and it enjoys the broad equitable authority necessary to fulfill this obligation. See *id.*, at 15–16; *Brown* v. *Board of Education*, 349 U. S. 294, 300 (1955); see also *Missouri* v. *Jenkins*, 495 U. S. 33 (1990).

---

[1] Indeed, in an alternative holding, the District Court concluded that a modification would not be warranted even under the "flexible" standard advanced in *Carey*. See *Inmates of Suffolk County Jail* v. *Kearney*, 734 F. Supp. 561, 565 (Mass. 1990).

## II

In June 1973, after finding that petitioners' incarceration of pretrial detainees in the Charles Street Jail violated constitutional standards, the District Court appropriately entered an injunction that went "beyond a simple proscription against the precise conduct previously pursued." *National Society of Professional Engineers* v. *United States*, 435 U. S. 679, 698 (1978). It required petitioners to discontinue (1) the practice of double celling pretrial detainees after November 30, 1973, and (2) the use of the Charles Street Jail for pretrial detention after June 30, 1976. *Inmates of Suffolk County Jail* v. *Eisenstadt,* 360 F. Supp. 676, 691 (Mass. 1973).

Petitioners did not appeal from that injunction. When they found it difficult to comply with the double-celling prohibition, however, they asked the District Court to postpone enforcement of that requirement. The court refused and ordered petitioners to transfer inmates to other institutions. The Court of Appeals affirmed. *Inmates of Suffolk County Jail* v. *Eisenstadt,* 494 F. 2d 1196 (CA1), cert. denied, 419 U. S. 977 (1974). When petitioners found that they could not comply with the second part of the 1973 injunction, the District Court postponed the closing of the Charles Street Jail, but set another firm date for compliance. While petitioners' appeal from that order was pending, the parties entered into the negotiations that produced the 1979 consent decree. After the Court of Appeals affirmed the District Court's order and set yet another firm date for the closing of the Charles Street Jail, *Inmates of Suffolk County Jail* v. *Kearney,* 573 F. 2d 98, 101 (CA1 1978), the parties reached agreement on a plan that was entered by the District Court as a consent decree, *Inmates of Suffolk County Jail* v. *Kearney,* Civ. Action No. 71–162–G (Mass., May 7, 1979), App. to Pet. for Cert. in No. 90–954, p. 15a.

The facility described in the 1979 decree was never constructed. Even before the plan was completed, petitioners recognized that a larger jail was required. In June 1984,

the sheriff filed a motion in the District Court for an order permitting double celling in the Charles Street Jail. The motion was denied. The parties then negotiated an agreement providing for a larger new jail and for a modification of the 1979 decree. After they reached agreement, respondents presented a motion to modify, which the District Court granted on April 11, 1985. The court found that modifications were "necessary to meet the unanticipated increase in jail population and the delay in completing the jail as originally contemplated." App. 110. The District Court then ordered that nothing in the 1979 decree should prevent petitioners

> "from increasing the capacity of the new facility if the following conditions are satisfied:
>     "(a) single-cell occupancy is maintained under the design for the facility;
>     "(b) under the standards and specifications of the Architectural Program, as modified, the relative proportion of cell space to support services will remain the same as it was in the Architectural Program . . . ." *Id.*, at 110–111.

There was no appeal from that modification order. Indeed, although the Boston City Council objected to the modification, it appears to have been the product of an agreement between respondents and petitioners.

In 1990, 19 years after respondents filed suit, the new jail was completed in substantial compliance with the terms of the consent decree, as modified in 1985.

### III

It is the terms of the 1979 consent decree, as modified and reaffirmed in 1985, that petitioners now seek to modify. The 1979 decree was negotiated against a background in which certain important propositions had already been settled. First, the litigation had established the existence of a serious

constitutional violation. Second, for a period of almost five years after the entry of the 1973 injunction—which was unquestionably valid and which petitioners had waived any right to challenge—petitioners were still violating the Constitution as well as the injunction. See *Inmates of Suffolk County Jail* v. *Kearney*, 573 F. 2d, at 99. Third, although respondents had already prevailed, they were willing to agree to another postponement of the closing of the Charles Street Jail if petitioners submitted, and the court approved, an adequate plan for a new facility.

Obviously any plan would have to satisfy constitutional standards. It was equally obvious that a number of features of the plan, such as the site of the new facility or its particular architectural design, would not be constitutionally mandated. In order to discharge their duty to provide an adequate facility, and also to avoid the risk of stern sanctions for years of noncompliance with an outstanding court order, it would be entirely appropriate for petitioners to propose a remedy that exceeded the bare minimum mandated by the Constitution. Indeed, terms such as "minimum" or "floor" are not particularly helpful in this context. The remedy is constrained by the requirement that it not perpetuate a constitutional violation, and in this sense the Constitution does provide a "floor." Beyond that constraint, however, the remedy's attempt to give expression to the underlying constitutional value does not lend itself to quantitative evaluation. In view of the complexity of the institutions involved and the necessity of affording effective relief, the remedial decree will often contain many, highly detailed commands. It might well be that the failure to fulfill any one of these specific requirements would not have constituted an independent constitutional violation, nor would the absence of any one element render the decree necessarily ineffective. The duty of the District Court is not to formulate the decree with the fewest provisions, but to consider the various interests involved and, in the sound exercise of its discretion, to

fashion the remedy that it believes to be best.[2]  Similarly, a consent decree reflects the parties' understanding of the best remedy, and, subject to judicial approval, the parties to a consent decree enjoy at least as broad discretion as the District Court in formulating the remedial decree.  Cf. *Firefighters* v. *Cleveland*, 478 U. S. 501, 525–526 (1986).

From respondents' point of view, even though they had won their case, they might reasonably be prepared to surrender some of the relief to which they were unquestionably entitled—such as enforcing the deadline on closing the Charles Street Jail—in exchange for other benefits to be included in an appropriate remedy, even if each such benefit might not be constitutionally required.  For example, an agreement on an exercise facility, a library, or an adequate place for worship might be approved by the court in a consent decree, even if each individual feature were not essential to the termination of the constitutional violation.  In

---

[2] It is the difficulty in determining prospectively which remedy is best that justifies a flexible standard of modification.  This relationship between the characteristics of a remedial decree in structural reform litigation and the flexible standard of modification is explained in the passage that Judge Friendly found to be the best statement of the applicable legal standard:

" 'The judge must search for the "best" remedy, but since his judgment must incorporate such open-ended considerations as effectiveness and fairness, and since the threat and constitutional value that occasions the intervention can never be defined with great precision, the intervention can never be defended with any certitude.  It must always be open to revision, even without the strong showing traditionally required for modification of a decree, namely, that the first choice is causing grievous hardship.  A revision is justified if the remedy is not working effectively or is unnecessarily burdensome.' "  *New York State Assn. for Retarded Children, Inc.* v. *Carey*, 706 F. 2d 956, 970 (CA2 1983) (quoting Fiss, The Supreme Court—1978 Term—Foreword: The Forms of Justice, 93 Harv. L. Rev. 1, 49 (1979)).

The justification for modifying a consent decree is not that the decree did "too much," but that in light of later circumstances, a modified remedy would better achieve the decree's original goals.

fact, in this action it is apparent that the two overriding purposes that informed both the District Court's interim remedy and respondents' negotiations were the prohibition against double celling and the closing of the old jail. The plan that was ultimately accepted, as well as the terms of the consent decree entered in 1979, were designed to serve these two purposes.

The consent decree incorporated all the details of the agreed upon architectural program. A recital in the decree refers to the program as "both constitutionally adequate and constitutionally required."[3] That recital, of course, does not indicate that either the court or the parties thought that every detail of the settlement—or, indeed, *any* of its specific provisions—was "constitutionally required." An adequate remedy was constitutionally required, and the parties and the court were satisfied that this program was constitutionally adequate. But that is not a basis for assuming that the parties believed that any provision of the decree, including the prohibition against double celling, was constitutionally required.[4]

---

[3] The relevant passage reads in full:

"And whereas all parties agree that for the purposes of this litigation the Suffolk County Detention Center, Charles Street Facility, Architectural Program which is attached and, as modified in paragraph 3 below, incorporated in this decree, sets forth a program which is both constitutionally adequate and constitutionally required." App. to Pet. for Cert. in No. 90–954, p. 16a.

[4] Consider, for example, the following provisions of the decree:

"(d) The paragraph headed 'A.1.a. Lobby/reception' on page 8 is changed by increasing the number of visitor lockers to one-hundred (100) and the tenth sentence in that paragraph is changed to read:

'Lobby should include public telephones, drinking fountain, vending machines and bulletin boards.'

"(j) The following paragraph shall be added to page 37:

'Inmate laundry rooms shall be located to permit convenient access and staff supervision. Room placement and the number of laundry rooms required shall be resolved during the design phase. Each inmate laundry

## IV

The motion to modify that ultimately led to our grant of certiorari was filed on July 17, 1989. As I view these cases, the proponents of that motion had the burden of demonstrating that changed conditions between 1985 and 1989 justified a further modification of the consent decree. The changes that occurred between 1979 and 1985 were already reflected in the 1985 modification. Since petitioners acquiesced in that modification, they cannot now be heard to argue that pre-1985 developments—either in the law or in the facts—provide a basis for modifying the 1985 order. It is that order that defined petitioners' obligation to construct and to operate an adequate facility.

Petitioners' reliance on *Bell* v. *Wolfish*, 441 U. S. 520 (1979), as constituting a relevant change in the law is plainly misplaced. That case was pending in this Court when the consent decree was entered in 1979. It was the authority on which the sheriff relied when he sought permission to double cell in 1984, and, of course, it was well known to all parties when the decree was modified in 1985. It does not qualify as a changed circumstance.[5]

---

room shall contain high quality washing and clothes drying equipment, sink, sorting table, storage and ironing board.'" *Id.*, at 17a, 18a.

[5] As the Court agrees that *Bell* v. *Wolfish* did not constitute a change in law requiring modification of the decree, see *ante*, at 388, the Court does not define further the kind of changes in law that may merit modification. In particular, the Court has no occasion to draw a distinction between the type of change in law recognized in *Railway Employes* v. *Wright*, 364 U. S. 642 (1961), and the change in law that petitioners assert was effected by *Bell*. The distinction is nevertheless significant and deserves mention. In *Railway Employes*, the plaintiffs originally brought suit, alleging that a railroad and its unions discriminated against nonunion employees, a practice prohibited by the Railway Labor Act, 45 U. S. C. § 151 *et seq.* The defendants entered into a consent decree, promising to refrain from such discrimination. When Congress subsequently amended the Act to permit union shops, the Court concluded that a modification allowing union shops should be granted so as to further the statutory purpose. In contrast to the situation presented in *Railway Employes*, it cannot be con-

The increase in the average number of pretrial detainees is, of course, a change of fact. Because the size of that increase had not been anticipated in 1979, it was appropriate to modify the decree in 1985.[6] But in 1985, the steady progression in the detainee population surely made it foreseeable that this growth would continue. The District Court's finding that "the overcrowding problem faced by the Sheriff is neither new nor unforeseen," *Inmates of Suffolk County Jail* v. *Kearney*, 734 F. Supp. 561, 564 (Mass. 1990), is amply supported by the record.

Even if the continuing increase in inmate population had not actually been foreseen, it was reasonably foreseeable. Mere foreseeability in the sense that it was an event that "could conceivably arise" during the life of the consent decree, see *ante*, at 385, should not, of course, disqualify an unanticipated development from justifying a modification. But the parties should be charged with notice of those events that reasonably prudent litigants would contemplate when negotiating a settlement. Given the realities of today's society, it is not surprising that the District Court found a con-

---

tended that *Bell* expressed a policy preference in favor of double celling. This distinction is well described by the United States, appearing as *amicus curiae:*

"*Bell* v. *Wolfish* . . . , which rejected a challenge to the constitutionality of double-celling, did not represent a policy decision *endorsing* such housing. In contrast, in amending the Railway Labor Act, Congress weighed the merits of various labor policies and specifically endorsed union shops. The amendment thus conflicted with the consent decree's *prohibition* of such clauses. *Bell*, in contrast, cast no doubt on the propriety of the single-cell requirement to which the parties here had agreed." Brief for United States as *Amicus Curiae* 20, n. 9.

[6] It should be noted that the figures cited by the Court, *ante*, at 386, n. 9, are drawn from a projection prepared before 1979. (The projection is published in a report dated January 1, 1979. See App. 61, 69.) By 1982, respondents believed that the 1979 projections underestimated the future inmate population. See Record, 2 App. 642–648. In 1985, petitioners knew that the average number of male prisoners detained in 1984 had been 320 instead of the projected number of 236. *Id.*, at 642–650.

tinued growth in inmate population to be within petitioners' contemplation.

Other important concerns counsel against modification of this consent decree. Petitioners' history of noncompliance after the 1973 injunction provides an added reason for insisting that they honor their most recent commitments. Petitioners' current claims of fiscal limitation are hardly new. These pleas reflect a continuation of petitioners' previous reluctance to budget funds adequate to avoid the initial constitutional violation or to avoid prolonged noncompliance with the terms of the original decree. The continued claims of financial constraint should not provide support for petitioners' modification requests.[7]

The strong public interest in protecting the finality of court decrees always counsels against modifications. Cf. *Teague* v. *Lane*, 489 U. S. 288, 308–310 (1989) (plurality opinion); *Mackey* v. *United States*, 401 U. S. 667, 682–683 (1971) (Harlan, J., concurring in judgments in part and dissenting in part). In the context of a consent decree, this interest is reinforced by the policy favoring the settlement of protracted litigation. To the extent that litigants are allowed to avoid their solemn commitments, the motivation for particular settlements will be compromised, and the reliability of the entire process will suffer.

---

[7] The Court refers to the need to "keep the public interest in mind" when deciding whether to modify a decree. *Ante*, at 392. It is certainly true that when exercising their equitable powers, courts should properly consider the interests of the "public." See *Brown* v. *Board of Education*, 349 U. S. 294, 300 (1955). It must be noted, however, that a remedial decree may well contain provisions that are unpopular; a requirement of additional expenditures to improve jail conditions might be an example of such an unpopular order. Mere unpopularity does not constitute a sufficient reason for modification. As the Court explained in *Brown:* "Courts of equity may properly take into account the public interest . . . . But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them." *Ibid.*

It is particularly important to apply a strict standard when considering modification requests that undermine the central purpose of a consent decree. In his opinion in *New York State Assn. for Retarded Children, Inc.* v. *Carey,* 706 F. 2d 956 (CA2 1983), Judge Friendly analyzed the requested modifications in the light of the central purpose "of transferring the population of Willowbrook, whose squalid living conditions this court has already recited, to facilities of more human dimension as quickly as possible." *Id.,* at 967. The changes that were approved were found to be consistent with that central purpose. In this action, the entire history of the litigation demonstrates that the prohibition against double celling was a central purpose of the relief ordered by the District Court in 1973, of the bargain negotiated in 1979 and embodied in the original consent decree, and of the order entered in 1985 that petitioners now seek to modify. Moreover, as the District Court found, during the history of the litigation, petitioners have been able to resort to various measures such as "transfers to state prisons, bail reviews by the Superior Court, and a pretrial controlled release program" to respond to the overcrowding problem. 734 F. Supp., at 565. The fact that double celling affords petitioners the easiest and least expensive method of responding to a reasonably foreseeable problem is not an adequate justification for compromising a central purpose of the decree. In this regard, the Court misses the point in its observation that "[i]f modification of one term of a consent decree defeats the purpose of the decree, obviously modification would be all but impossible." *Ante,* at 387. It is certainly true that modification of a consent decree would be impossible if the modification of *any* one term were deemed to defeat the purpose of the decree. However, to recognize that *some* terms are so critical that their modification would thwart the central purpose of the decree does not render the decree immutable, but rather assures that a modification will frustrate

neither the legitimate expectations of the parties nor the core remedial goals of the decree.

After a judicial finding of constitutional violation, petitioners were ordered in 1973 to place pretrial detainees in single cells. In return for certain benefits, petitioners committed themselves in 1979 to continued compliance with the single-celling requirement. They reaffirmed this promise in 1985. It was clearly not an abuse of discretion for the District Court to require petitioners to honor this commitment.

I would affirm the judgment of the Court of Appeals.