**EQUAL EMPLOYMENT OPPORTUNI-TY COMMISSION, and the City of New York, Plaintiffs,**

v.

**LOCAL 638 ... LOCAL 28 OF the SHEET METAL WORKERS INTERNATIONAL ASSOCIATION, et al., Defendants.**

**No. 71 Civ. 2877 (RLC).**

United States District Court, S.D. New York.

April 3, 1996.

regard to the "policy" that applies to the particular dispute. *See id.*

Paul A. Crotty, Corporation Counsel of the City of New York, New York City, for Plaintiffs; Paul E. Kazanoff, Hilary B. Klein, of counsel.

Edmund P. D'Elia, P.C., New York City, for Defendant Local 28 of the Sheet Metal Workers International Association; Edmund P. D'Elia, Johanna M. Loonie, of counsel.

ROBERT L. CARTER, District Judge.

Plaintiff the City of New York (the "City") moves to modify the court's order and opinion of March 8, 1995, *EEOC v. Local 638 ... Local 28*, 889 F.Supp. 642 (S.D.N.Y.1995) (Carter, J.) (the "Contempt Order") pursuant to Rule 7, F.R.Civ.P., and Paragraph 27 of the Order and Judgment in this case dated August 28, 1975 ("O & J"). Plaintiff seeks such modification to establish a hiring hall operator selection committee that will recommend an operator for the hiring hall established in the Contempt Order and to provide compensation to plaintiff's representatives to such committee. Defendant Local 28 of the Sheet Metal Workers International Association ("Local 28" or "the Union") opposes only the compensation of plaintiff's representatives and requests the court to postpone determination pending the findings of an audit of Local 28's financial condition ordered by the Administrator pursuant to the court's opinion dated June 7, 1995, *EEOC v. Local 638 ... Local 28*, No. 71 Civ. 2877, slip op. at 8–9, 1995 WL 355589 (S.D.N.Y. June 7, 1995) (Carter, J.). Alternatively, Local 28 seeks an order that any such compensation be paid from the Employment, Training, Education and Recruitment Fund ("ETER fund").

## I. Background

In the Contempt Order, with which familiarity is assumed, the court ordered, *inter alia*, the establishment of a hiring hall, as one of the remedies for the Union's violations of the Amended Affirmative Action Plan & Order ("AAAPO") and O & J.[1] While the

---

1. The court found that the Union failed to achieve the membership goal, to ensure equal work opportunities for its white and nonwhite members, and to keep accurate and complete records in direct violation of the terms of the AAAPO and O & J. Contempt Order at 652–68

court directed the Administrator to choose the hiring hall operator from among candidates proposed by plaintiffs and defendants, the Contempt Order did not specify a method for so doing.

Defendant does not contest plaintiff's recital of the facts subsequent to the Contempt Order. On May 1, 1995, and with the parties' consent, the Administrator established a committee to screen candidates for the hiring hall operator position.[2] He requested that plaintiff and defendant each select appointees to the committee. Within the next week or so, plaintiff and defendant notified the Administrator of their respective appointees.[3] On May 30, 1995, the Sheet Metal Air Conditioning Contractors National Association of Long Island, Inc. notified the Administrator of its appointee.[4]

On June 1, 1995, the City wrote to the Administrator requesting that the Union compensate the plaintiff's appointees to the hiring hall committee at the journeyperson hourly rate. The Union did not oppose the City's request until June 23, 1995—after the first meeting of the committee (on June 19, 1995) in which the Administrator, having received no opposition from the Union, had so ordered the Union to compensate the plaintiff's appointees for their time.

In its June 23, 1995 letter of opposition,[5] the Union stated that it refused to accept responsibility for paying plaintiff's appointees for their time, that its own appointees had volunteered their time, and that alternatively, plaintiff's appointees should be paid from the ETER fund. Plaintiff then moved the Administrator for an order compelling Local 28 to pay the plaintiffs' appointees.

The Administrator rendered a Memorandum and Order, dated August 16, 1995, in which he concluded, *inter alia*, that Local 28 had not objected to compensation of plaintiffs' appointees in a legally untimely manner; that the submissions before him were insufficient to make a finding of retaliation by Local 28 against Green and Pearson for speaking against the Union's discriminatory history;[6] that Local 28's distinction between the long-term nature of other committees and the short-term nature of the Hiring Hall Committee was frivolous and therefore rejected; and that he would have ordered Local 28 to pay "the small amount of compensa-

("the union's misreporting of census data, in violation of the AAAPO, has resulted in the inflation of its nonwhite union membership for each year from 1984–1991, and in the obfuscation of its abysmal lack of progress toward meeting the AAAPO's 29.23% nonwhite membership goal"; "the union's adoption of its restrictive reinitiation policy has the effect, if not purpose, of discriminating against non-whites in their readmission to the union, illustrating the union's clear and convincing noncompliance with the court's orders. The reinitiation policy has a disparate negative impact on nonwhites, who are overrepresented among journeypersons terminated for their inability to pay dues.").

In response to the plaintiff's motion for contempt, the parties had stipulated to the establishment of a hiring hall. While the court ordered the establishment of a hiring hall, the court did not accept *in toto* the model of the hiring hall as put forth in the stipulation. Contempt Order at 686.

**2.** As reasoned by the Administrator:

[I]n an effort to establish a reasonable approach to the candidate evaluation and recommendation process, obtain the guidance of all parties as to the qualifications for the position, and ensure that representatives of the class (which the court found disadvantaged by the existing methods of obtaining employment) would be directly involved, I proposed that the candidates be nominated by a Hiring Hall Operator Selection Committee comprised of appointees representing the interests of plaintiffs, Local 28, and the contractors. The parties agreed to that approach.

Memorandum and Order, David Raff, Administrator, No. 71 Civ. 2877, dated 8/16/95, at 4.

**3.** Plaintiff selected Scott Green and Mel Pearson as their representatives. Local 28 selected Matthew Froehlich and Fred Newman. Plaintiff's appointees are the only African–American Union members on the committee and are the only committee members who are not employed in permanent managerial positions for contractors.

**4.** Local 28 is the only defendant involved in this motion. However, it is as a result of the Contempt Order that the contractors' association is a part of the relief ordered and therefore has a representative on the hiring hall committee.

**5.** The Administrator received this letter by facsimile on June 26, 1995.

**6.** However, the Administrator found that the submissions were sufficient to raise suspicion about Local 28's motivation for refusing to compensate Green and Pearson.

tion requested" if he had the authority to do so. Memorandum and Order, David Raff, Administrator, No. 71 Civ. 2877, dated 8/16/95, at 5, 6, 8, 11. Thus, the Administrator denied plaintiff's motion and reversed his oral order providing for compensation.

## II.  Modification

As noted in previous opinions and orders, "[a]t any time, any of the parties herein may apply to the Administrator and then to the Court for the purpose of seeking additional orders to insure the full and effective implementation of the terms and intent of [AAA-PO]." *EEOC v. Local 638 ... Local 28,* 421 F.Supp. 603, 617 (S.D.N.Y.1975) (Werker, J.).[7]  The Second Circuit has affirmed the court's continuing jurisdiction "to enter such orders as may be necessary to effectuate the equal employment opportunities for non-whites and other appropriate relief" without there being a change in law or fact that may be necessary for modification in other situations. *EEOC v. Local 638 ... Local 28,* 753 F.2d 1172, 1185 (2d Cir.1985); *see also EEOC v. Local 638 ... Local 28,* 889 F.Supp. at 683.  (citing *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992)).

## A.  Hiring Hall Committee

■  The court modifies the Contempt Order to authorize the formation of the Hiring Hall Committee.[8]  The court is persuaded that the committee is a reasonable method for securing the guidance and experience of all parties regarding the qualifications for the hiring hall operator and the development of an effective process for recommendations and candidate evaluations.  It also assures the direct involvement of the representatives of the class.  *See* Memorandum and Order, David Raff, Administrator, No. 71 Civ. 2877, dated 8/16/95, at 4.

## B.  Compensation

■  With regard to compensation, plaintiff argues that payment to its committee representatives by the Union is consistent with the court's intent that the Union pay for the implementation and operation of the hiring hall as well as the implementation costs of its orders.  Local 28 counters that "[s]omething must be done to stop the bleeding." (Def.'s Affirmation in Opp'n. to Pl.'s Mot. to Modify Court Order ¶ 12).  Therefore, it argues, this motion should be stayed, pending the court-authorized financial audit to assess the financial implications of the Contempt Order, because it cannot absorb more costs.  While the Union's acts that led to the most recent and previous contempt findings reveal that Local 28 did little to alleviate the suffering of its nonwhite members due to years of discriminatory treatment, the Union's plea fails because the sum requested is but a small and finite amount.

At the time plaintiff made the present motion in October, 1995, the committee was meeting every two weeks for approximately two and a half hours.  At $35.00 per hour, Green and Pearson each would receive $87.50 per meeting.  At a minimum, the Union would have to pay each man approximately $1600.00 (nine months of meetings twice per month) up through March, 1996, and another $1050.00 apiece if the meetings continued at the same pace for another 6 months.[9]  Even under a more costly scenario, where the committee met more frequently, the sum would

---

7.  Specifically, the court retains the power:

>   to require Local 28 and/or JAC to modify, amend or change their work referral and employment activities, or institute or undertake additional procedures or activities regarding work referral or employment in order to (i) assist non-white journeymen and apprentices of Local 28 in obtaining employment or (ii) protect non-white journeymen and apprentices of Local 28 from bearing a disproportionate burden of unemployment.
>
>   O & J ¶ 21(g).

8.  The formation of this committee was unopposed.

9.  The court is cognizant of the difficulties so far experienced resulting from the "deep animosity and suspicions" between the parties, *see* Memorandum and Order, David Raff, Administrator, No. 71 Civ. 2877, dated 8/16/95, at 8 n. 3.  I have therefore considered the possibility of meetings for another six months despite the court's order that the hiring hall be functioning within three months of the Contempt Order.

be small.[10] The court does not find compensation to be so burdensome as to warrant delay until the financial audit is completed. The defendant has not provided persuasive evidence to the contrary.[11]

■ Although the contemnor—Local 28—does not have the burden of production on the issue of financial resources, the contemnor's failure to provide information about its financial resources "may not be charged against the [plaintiff] or result in a holding that the district court abused its discretion in imposing the sanction." *EEOC v. Local 638 ... Local 28,* 889 F.Supp. at 668 (citing *Dole Fresh Fruit Co. v. United Banana Co.,* 821 F.2d 106, 110 n. 3 (2d Cir.1987) and *In re Grand Jury Witness,* 835 F.2d 437, 443 (2d Cir.1987), *cert. denied sub nom. Arambulo v. United States,* 485 U.S. 1039, 108 S.Ct. 1602, 99 L.Ed.2d 917 (1988)). Therefore, it is within the district court's equitable powers to direct the Union to compensate plaintiff's representatives in order to bring the contemnor into compliance. *EEOC v. Local 638 ... Local 28,* 889 F.Supp. at 668 (citing *Perfect Fit Indus., Inc. v. Acme Quilting Co.,* 673 F.2d 53, 57 (2d Cir.), *cert. denied,* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982)).

The court's modification of the Contempt Order moots defendant's comparative argument—that unlike the Four Year Experience Board, the Joint Advisory Committee, or the

Apprentice Selection Board, the hiring committee is not a long-term committee created to effectuate the AAAPO and therefore compensation is not warranted—because the committee is now established pursuant to the Contempt Order.

■ The court also rejects the Union's suggestion that compensation to plaintiff's representatives should come from the ETER fund. As all parties are aware, payment into the fund by defendant was a coercive measure to induce the Union to increase its nonwhite membership. *EEOC v. Local 639 ... Local 28,* 753 F.2d at 1184; *EEOC v. Local 639 ... Local 28,* Contempt Order at 670. While part of the ETER fund's purpose is "to provide financial support for out-of-work nonwhite journeymen to encourage them to stay in the trade and to upgrade their skills," *EEOC v. Local 638 ... Local 28,* 753 F.2d at 1178, the participation of plaintiff's representatives on the committee fulfills a different purpose: "to effectuate the equal employment opportunities for non-whites and other appropriate relief" by enabling the establishment of the hiring hall.

The court takes note of the economic disparity between Green and Pearson and the other committee representatives who have been consistently employed in high level jobs.[12] However, it is the Union's history of

---

10. If the committee began to meet every week, from the date of this motion through the following year (i.e., up through October, 1996), the Union would pay (1) Green and Pearson each $700.00 for meetings (twice a month) through October 1995 and (2) another $3850.00 apiece for meetings through October, 1996 (four times a month from November, 1995 up through October, 1996). Each of the plaintiff's representatives would receive a total of $4550.00.

11. Local 28 states that its available cash balance is $523,502.00 as of the "Statement of Revenues and Expenses and Changes in Fund" dated June 30, 1995. The Union states that this cash balance is encumbered because Local 28 must use this account to satisfy "various liabilities such as accounts payable and accrued expenses." (Aff. of Gary Topple, Certified Public Accountant for Local 28, of 11/9/95, at ¶ 6). The court is aware that each month may not result in identical withdrawals from the cash balance to pay these liabilities. However, Local 28 does not even provide a two or three month example to demonstrate that the cash balance is exhausted after payments of these two liability accounts.

Similarly, the court has found at least twice before that Local 28 has failed to provide the court with enough information to determine how much the Union can afford to pay. *See EEOC v. Local 638 ... Local 28,* No. 71 Civ. 2877, slip op. at 8, 1995 WL 355589 (S.D.N.Y. June 7, 1995) (Carter, J.); Contempt Order at 669 (finding the report of the Union's certified public accountant so general as to be a "blanket denial of the union's ability to pay rather than a realistic analysis of the union's financial situation.").

12. Both Pearson and Green have be unemployed for substantial periods over the past few years, and Pearson has been unemployed almost continuously since plaintiff's contempt motion was filed. Local 28 representative Newman is the General Manager for C.W. Sheet Metal Corporation. Previously he was the General Manager for United Sheet Metal Corp. and shop foreperson for The Brandt Corporation Universal Sheet Metal for 12 years. Local 28 representative Froehlich has been a project manager for Heritage Sheet Metal for the past five years and previously was the General Superintendent for Alpine Sheet

discrimination and spurning of court-ordered remedies that compels the court to modify the Contempt Order to ensure effective implementation of the intent and terms of the AAAPO and O & J. The court-ordered hiring hall is a mechanism to ensure equal employment for nonwhites once they become journeypersons—an area where the court previously found Local 28 most effectively discriminated. Contempt Order at 673 ("The hiring hall system would require the union to wield its job-referral power on behalf of its nonwhite members as it does for its white members.").

Thus, it is imperative that both defendant and plaintiff be represented on the committee and that plaintiff's representatives contribute their insight into and knowledge of the craft and industry. Plaintiff's representation on the committee also ensures that selection of a hiring hall operator does not become an opportunity for Local 28 to recast the remedy of a hiring hall in its favor. Compensation to plaintiff's representatives by Local 28 facilitates plaintiff's ability to participate in the selection of a hiring hall operator—a necessary component for effectuating the intent and terms of the AAAPO and O & J.

## III. Order

The Administrator shall establish a hiring hall committee with representatives from the class members, Local 28, and other parties as is appropriate.

Local 28 shall compensate plaintiff's representatives each at the journeyperson rate of $35.00 per hour for attendance of and preparation for committee meetings, plus travel time and expenses, less any $50.00 per meeting payment received pursuant to the Administrator's Order dated August 16, 1995. Each $50.00 payment that is subtracted from Local 28's payment to plaintiff's representatives should then be paid to the ETER fund.

IT IS SO ORDERED.

Metal before, during and after construction of the World Trade Center. The contractors' association representative, Spencer Rothenhausen, is the owner of Eastern Metalworks, Inc.