Anthony T. LEE, et al., Plaintiffs,

United States of America, Plaintiff–Intervenor and Amicus Curiae,

National Education Association, Inc., Plaintiff–Intervenor,

v.

AUTAUGA COUNTY BOARD OF EDUCATION, et al., Defendants.

No. CIV. A. 70–T–3098–N.

United States District Court, M.D. Alabama, Northern Division.

July 29, 1999.

Fred D. Gray, Fred D. Gray, Jr., Gray, Langford, Sapp, McGowan, Gray & Nathanson, Tuskegee, AL, Dennis D. Parker, NAACP Legal Defense Fund, New York City, for Plaintiffs.

James R. Seale, Martha Ann Miller, Robison & Belser, Montgomery, AL, for Defendant School Board.

Redding Pitt, United States Attorney's Office, Montgomery, AL, LeVern M. Younger, U.S. Department of Justice, Civil Rights Division, Educational Opportunities Section, Washington, DC, for Intervenor United States.

## OPINION

RODRIGUEZ, District Judge.[1]

This longstanding school-desegregation case came before the court on a petition by the defendant Autauga County Board of Education ("the Board") for approval of a plan to close the predominantly African-American Autaugaville High School in Autaugaville, Alabama and transfer the Autaugaville students in grades nine through twelve to the predominantly White Prattville High School in Prattville, Alabama. The court held an evidentiary hearing and heard arguments on the matter on June 21 and 22, 1999. After considering the evidence and arguments presented by the parties, the court denied the petition in an order entered on June 29, 1999.[2] This opinion explains the court's reasons for denying the petition.

## I. BACKGROUND

This case began as part of a state-wide action challenging under the Fourteenth Amendment to the United States Constitution the State of Alabama's operation of a racially segregated school system. The Autauga County public school system was ordered desegregated in 1970. The desegregation order established four attendance zones: Billingsley in the northwest quadrant of the county, Marbury in the northeast quadrant, Prattville in the southeast quadrant, and Autaugaville in the southwest quadrant.[3] The Billingsley, Marbury, and Autaugaville zones comprise rural areas, while the Prattville zone contains Prattville, a rapidly growing suburb of Montgomery, Alabama.

The Autaugaville area historically has been and continues to be predominantly African-American, whereas the rest of the county is predominantly White. In 1970, the school population in Autaugaville was 89 percent African-American and 11 percent White.[4] In part because a private academy opened in Autaugaville in 1970 to serve the White students in the zone, the school has never had a significant number of White students.

In the 1998–99 school year, Autaugaville High School had a total of 127 students in grades nine through twelve, 98 percent of whom were African-American and the rest of whom were White.[5] Billingsley School had a total of 208 students in grades nine through twelve, 44 percent of whom were

1. Hon. Joseph H. Rodriguez, United States District Court for the District of New Jersey, sitting by designation pursuant to 28 U.S.C. § 295.

2. The court issued the order without accompanying explanation in an effort to accommodate the defendants' request that the court render its decision on the petition before June 30, 1999.

3. Joint Submission of Exhibits and Contentions (hereafter "J.S."), ex. 32.

4. *Id.*

5. J.S., ex. 29–2.

African–American and the rest of whom were White.[6] Prattville High School had a total of 1,698 students, 11 percent of whom were African–American and 87 percent of whom were White.[7] Marbury School had approximately the same number of students as Billingsley in grades nine through twelve, but had a much higher percentage of White students. The Board spends $7,338.73 per student per year at Autaugaville High School, $4,240.09 per pupil at Billingsley High School, and $3,526.44 per pupil at Prattville High School.[8] The student-to-teacher ratio at Autaugaville High was approximately 11.49 to 1 in 1997–98 and 14.8 to 1 in 1998–99, while at Prattville it was approximately 20.69 to 1 in 1997–98 and about 22 to 1 in 1998–99.[9] Prattville High School has a much larger selection of classes and extracurricular activities than does Autaugaville, Marbury, or Billingsley high schools.[10] The three small rural schools have approximately the same course offerings.[11] The Board will offer at Autaugaville High School any elective offered at Prattville, Marbury, or Billingsley high school if twelve or more students select that elective course.[12]

Until recently, Autaugaville had two public schools, one for kindergarten through sixth grade and one, the Autaugaville High School, for seventh through twelfth grade, both of which had been used in the segregated school system prior to 1970. In 1996, Dr. John Bell, a desegregation expert, studied the Autauga County school system for the United States Department of Justice. He found that after desegregation, the Autauga County Board of Education failed to take reasonable steps to upgrade the schools. He observed that the Autaugaville schools "were the worst facilities in the District, and have remained so to the present date." [13] Indeed, the condition of the schools was so bad that Bell remarked that "in his thirty years of auditing school districts as a federal civil rights official and consultant, [he] had never visited any public schools in the state of disrepair which existed at the two Autaugaville schools." [14] Furthermore, although some of the damage at the schools was vandalism, he attributed 95 percent of the damage to the Board's failure to provide maintenance.[15]

Despite its dilapidated state, the Autaugaville High School has played an important role in the community life of Autaugaville. The school's football and basketball teams and its band are a great source of community pride and spirit. The football team regularly competes for state-level championships. The school band represents the town around the state and performs at community functions in Autaugaville.[16] According to Dr. Bell, "[t]he black school like the black church is the center of black activity" [17] and often plays a more important role in an African–American community than in a White one because of the lack of organized activities and social functions available to the children outside

---

6. *Id.*

7. *Id.*

8. J.S., ex. 29–3.

9. J.S., ex. 29–4; Testimony of Sarah Murchison at hearing on June 21, 1999, at 125.

10. J.S., exs. 6, 9, 10.

11. Murchison testimony at 155.

12. The Board also has a majority-to-minority transfer option which permits African–American Autaugaville students to attend Prattville High School if they so elect. It is unclear how many have done so. The record indicates that, in the 1998–99 school year, 83 Autaugaville students transferred to other schools in the Autauga County school system under the majority-to-minority transfer policy. Murchison testimony at 97. A fair number of those students likely chose to attend Prattville High School.

13. J.S., ex. 2 at 8.

14. *Id.*

15. Testimony of John Bell, Ph.D., at hearing on June 22, 1999, at 142.

16. Testimony of Adell Wilson at hearing on June 22, 1999, at 146.

17. J.S., ex. 34 at 48.

of school in the average African–American community.[18] Bell found that such activities do not exist outside of school in Autaugaville.[19]

The students at Autaugaville High have not scored as well, on average, as the students at Prattville or Billingsley on the Stanford Achievement Test.[20] The achievement test lag between Autaugaville and the students at the district's other schools averaged 35 percentile points at all grades.[21] A lower percentage of seniors at Autaugaville pass the high-school exit exam than at the other Autauga County high schools.[22] As a result of the school's test scores, the State of Alabama put Autaugaville High School on "alert" status in 1996, "caution" status in 1997, and "alert 1" status in 1998.[23] This means that if, after a certain period of time the test scores of the students do not improve, the State Board of Education could take over the school. The State rated the other high schools in the County "clear."[24]

These are not the only problems facing African–American students in the Autauga County public schools. In 1996, Dr. Bell's study of the Autauga County school system revealed "a substantial over-representation of Black students assigned to the District's mental handicapping programs."[25] In 1995–96, for example, African-American students comprised 19.95 percent of the Prattville High School population, but 50.8 percent of its special-education students and 67.2 percent of the children classified as educable mentally handicapped.[26] At the Billingsley school, African–American students comprised 37 percent of the student population[27] but 72.8 percent of the school's special-education population.[28] At Marbury, African–Americans comprised 9.6 percent of the student population but 24.6 percent of the special-education.[29] Bell also found under-representation of African–American students in the gifted and talented programs of the District.[30] In the 1995–96 school year, no African–American students were placed in the gifted-and-talented program at Prattville High School.[31] Bell, who formerly served as an official for the federal Department of Health, Education, and Welfare and the Department of Education's Office of Civil Rights, testified that the size of the statistical disparity between expected and actual representation of African–Americans in the special-education and gifted-and-talented programs at Prattville High School was such that it would have prompted a full investigation of the disparity when he was a federal civil rights official.[32]

### Plan 2000

All of the attendance zones within the Autauga County School District except the Autaugaville zone have increased in stu-

18. Bell testimony at 129–30.

19. *Id.* at 130.

20. J.S., ex. 29–6 at 1–3.

21. J.S., ex. 4 at 2.

22. *Id.*

23. *Id.* at 3. The ratings proceed as follows from best to worst: "clear," "caution," "alert," "alert 1," and "alert 2."

24. *Id.* at 1, 2.

25. J.S., ex. 2 at 69.

26. *Id.* at 64; Bell testimony at 113. The expected percentage would be about 20 to 25 percent African–American. *Id.* at 112.

27. J.S., ex. 29–2.

28. J.S., ex. 2 at 70.

29. *Id.*

30. J.S., ex. 2 at 20–23.

31. Bell testimony at 110–11.

32. Bell testimony at 111, 112–13. Bell was a Division Director at the Department of Health, Welfare, and Education for fourteen years and served as a Deputy Regional Director and Director at the Office of Civil Rights of the Department of Education for two years. J.S., ex. 1 at 2.

dent population since 1970.[33] In the late 1990s, the populations of most schools have continued to grow, except the Autaugaville and Marbury schools, both of which have lost students since the 1995–96 school year.[34]

In part to accommodate this population growth, in June 1995, the Board sought approval of a five-year construction project known as "Plan 2000." Plan 2000 provided for the construction of a new kindergarten-through-twelfth-grade school in the Autaugaville zone to replace the two then-existing schools, two new kindergarten-through-sixth-grade schools in the Prattville zone, and a number of improvements to existing schools.[35] Plan 2000 also moved the line dividing the Marbury and Prattville attendance zones to the south, thereby enlarging the Marbury zone and decreasing the Prattville zone.

Although Plan 2000 included no direct effort to decrease the racial identifiability of the Autaugaville schools, the Board apparently hoped it would have a mildly desegregative effect. In arguing for the approval of Plan 2000, the Board wrote, "The consolidation of the two present schools in Autaugaville will result in a modern, state of the art school with laboratories and technology which has not been available in the past. Hopefully, this will lure a certain number of White students back to this school." [36]

Despite the continuance of the Autaugaville school as a predominantly one-race school, the plaintiffs lodged no objection to Plan 2000 because they felt that "there are not acceptable alternatives which do no impact disparately on blacks." [37] Although it originally opposed the plan because it would continue the segregation, the United States ultimately withdrew its objections.

On January 8, 1996, United States District Court Judge Myron H. Thompson approved Plan 2000 upon the recommendation of Magistrate Judge Charles S. Coody.

Construction of the new Autaugaville school was to be completed by 1997, but was delayed due to litigation concerning the land on which the school was to be built. The school will be ready for the 1999–2000 school year and will have a capacity of approximately 600 students.[38]

### The June 1997 Consent Decree

On October 27, 1995, the Autauga County Board of Education filed a petition to have the Autauga County school system declared unitary. On June 18, 1997, the parties filed with the court a consent decree resolving the Board's petition to be declared unitary. The decree provided that the prior orders of the court would "continue in full force and effect except to the extent that they are modified by this order" [39] and that the decree complied with the Fourteenth Amendment to the Constitution. Under the decree, the Autauga County school system was declared to have achieved unitary status in the areas of transportation, physical facilities, discipline, and equity in salary supplements.[40] At the same time, the consent decree withheld a declaration of unitary status in the areas of faculty and staff, curriculum, extracurricular activities, student assignment, special programs, special education, drop-out intervention, advanced programs, majority-to-minority transfers, and student achievement.[41]

To achieve unitary status in the remaining areas, the decree commits the Board to take certain actions, implement certain programs, and render annual reports de-

33. J.S., exs. 11a, 11b.

34. J.S., exs. 11b, 11c.

35. J.S., ex. 19 and ex. D thereto.

36. J.S., ex. 19 at 6.

37. J.S., ex. 20.

38. Murchison testimony at 114.

39. J.S., ex. 20 at 5.

40. J.S., ex. 12 at 6.

41. *Id.*

tailing compliance and progress over a three-year period.[42] The decree provides that, at the end of the three years, the Board would "make a full and complete written submission addressing in detail all facets of this Decree which shall show to the court and the Plaintiff parties that the district has complied with all the provisions of the Consent Decree." At that time, the decree permits the Board to file a petition to have the school district declared unitary, and to dismiss the action.[43]

The decree sets forth a number of specific requirements for the Board. First, the Board is required to "consult with experts in the field of education in an effort to evaluate existing District programs, and to develop new plans as necessary and appropriate to achieve compliance with" the decree. The Board specifically agreed to "invite a representative of the Southeastern Equity Center in Miami, Florida to visit the district, evaluate its situation and make recommendations as to measures which can be taken and/or programs which can be implemented to achieve compliance with this Order and to enable the system to achieve unitariness." The Board further agreed to "give due consideration to any recommendations which might be made by the Equity Center and to consider implementing such of those recommendations which appear to the Board to be feasible and for which funding can be obtained."[44] The Board also promised to "study and evaluate the feasibility of creating/establishing a magnet school at the new Autaugaville K–12 school."[45]

As for the goal of parity in curriculum offerings, the decree provides that the Board "shall conduct a curricula study to evaluate the curricula offered at each of its schools and shall endeavor to offer at Autaugaville High School, Billingsley High School, and Marbury High School as broad a selection of courses as is reasonably practicable consistent with student populations, student interests and preferences and available teacher units."[46] The decree also compels the Board to "make every reasonable effort to make a desired course accessible to students at all high schools in the system by adjusting schedules for such students if practicable and by providing free transportation where feasible, or by utilizing computer distant ("networked") instruction."[47] The Board additionally agreed to "develop and implement a plan to address the underachievement of Autaugaville students which shall include arrangements for the provision of remedial, compensatory and tutorial programs if deemed necessary and appropriate."[48]

The Board has made efforts to comply with certain parts of the decree. Dr. Leonard C. Beckum evaluated the Autauga County schools on behalf of the Southeastern Equity Center, although his evaluation may have been truncated because of the Board's delay in contacting him and the nature of the Board's request for assistance. Beckum supports the Board's proposal to transfer the students.

### The Current Petition

On April 12, 1999, the Board filed a petition for approval of a plan to transfer all Autaugaville students in grades nine through twelve to Prattville and Billingsley[49] high schools and to maintain a K–8 school in Autaugaville.[50] The plan also

---

42. *Id.*

43. *Id.*

44. *Id.* at 6–7.

45. *Id.* at 17.

46. *Id.* at 21–22.

47. *Id.* at 22.

48. *Id.*

49. Under the terms of the plan, only those students who had previously attended Billingsley school, approximately 20 students, would have the option of attending Billingsley. If they do not exercise that option, they would attend Prattville.

50. *See* Petition for Approval of Plan for Autaugaville K–12 Students and Request for Expedited Hearing, filed April 12, 1999, and ex. A thereto.

provided for the establishment of a magnet school for grades four through eight in the Autaugaville school and the possible future establishment of a magnet high school somewhere in Autaugaville in 2004 or 2005, depending on population growth and the availability of funds.

Under the plan, Autaugaville students would ride to the Autaugaville school on the bus, a trip which takes up to an hour and nine minutes, and would then be transferred to buses to take them to Prattville, a ride which would take additional time of between 15 and 30 minutes. The school would also provide a number of special services to ease the transition of the students from Autaugaville to Prattville.

## II. DISCUSSION

The court is faced with the very difficult issue of whether to allow the Board to go forward with its plan to transfer the Autaugaville high-school students to Prattville High School or to allow the Autaugaville students to attend high school at the new Autaugaville school and require the Board to continue to seek unitary status under the terms of the June 1997 consent decree. The first question the court must address is what standards will govern its decision. The parties seemingly agree, as does the court, that the applicable standard is that for modification of a consent decree.

The plaintiffs argue that the court should reject this plan because the Board cannot demonstrate changed circumstances sufficient to warrant modification of the consent decree. They further argue that, under the proposed plan, the burdens of desegregation would be placed entirely on African–American students and on the

community of Autaugaville, which would lose an important institution in the life of the community. They contend that the Board has not carried out its duties under the consent decree and therefore has not given the decree an opportunity to work. In contrast, the Board contends that there are changed circumstances sufficient to warrant modification of the consent decree and that, in any event, the proposed plan is in the best interests of the students of Autaugaville. The Board points out that the test scores of the students at Prattville are significantly better, Prattville offers a broader selection of courses and extracurricular activities, and Prattville is a racially diverse environment.[51] The United States concurs with the Board.

Consent decrees are "judicial decree[s] ... subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 378, 112 S.Ct. 748, 757, 116 L.Ed.2d 867 (1992). Thus, modification of a consent decree is governed by Federal Rule of Civil Procedure 60(b), which provides:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (5) ... it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment....

*Id.* In *Rufo,* the Supreme Court articulated a flexible, two-pronged approach to determining when courts may modify consent decrees in institutional-reform cases. The first prong requires that the party seeking

---

**51.** The Board also argues that, under the standards provided by four cases it discusses, the court should approve the proposal. The four cases provide standards for judging whether courts should approve desegregation plans that involve closing predominantly African–American schools. *See Harris v. Crenshaw County Bd. of Educ.,* 968 F.2d 1090 (11th Cir.1992); *Adams v. Bd. of Public Educ.,* 770 F.2d 1562 (11th Cir.1985); *Lee v. Anni-* ston *City School System,* 737 F.2d 952 (11th Cir.1984); *Lee v. U.S., Nat. Educ. Ass'n,* 914 F.Supp. 489, 493 (N.D.Ala.1996). However, these cases are inapposite and of little guidance because the courts in those cases did not have to decide whether modification of a consent decree was justified. Because the court finds that modification is not justified, the court will not reach the issues raised by these cases.

modification of the consent decree "establish that a significant change in facts or law warrants revision of the decree." *Id.* at 760, 112 S.Ct. at 765. *See also Ensley Branch, NAACP v. Seibels,* 31 F.3d 1548, 1563 (11th Cir.1994). If the moving party satisfies the changed-circumstances requirement, the second prong requires that the modifications be "suitably tailored" to address the new factual or legal environment. *Rufo,* 502 U.S. at 393, 112 S.Ct. at 765.[52]

■ The Board argues that a change in factual circumstances justifies modification of the consent decree. The *Rufo* court enumerated three situations in which modification of a consent decree for a change in facts may be warranted: (1) "when changed factual conditions make compliance with the decree substantially more onerous[;] . . . (2) when a decree proves to be unworkable because of unforeseen obstacles[;] . . . or (3) when enforcement of the decree without modification would be detrimental to the public interest." *Id.* at 384–85, 112 S.Ct. at 760 (citations omitted). The Court emphasized that ordinarily "modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree."[53] *Id.*

The Board points to the following facts in support of its bid to modify the June 1997 consent decree. Superintendent Sarah Murchison came into office in July 1997, shortly after entry of the consent decree. She requested input from her staff concerning compliance with the consent decree and specifically about programs to be offered students at Autaugaville High School. She and her staff determined that students at Autaugaville High School could not be offered the same programs as are offered to students in grades nine through twelve at Prattville High School.

This does not constitute a change in facts sufficient to warrant modification of the consent decree under *Rufo.* First, the Board has pointed to no significant change in facts that makes the implementation of the consent decree more onerous. The only change in facts the Board presents is the installation of a new superintendent. However, the Board has not shown that installation of Superintendent Murchison made implementation of the consent decree more onerous, nor could it.

---

52. In *Jacksonville Branch, NAACP v. Duval Cty. School Bd.,* 978 F.2d 1574 (11th Cir. 1992), the Eleventh Circuit Court of Appeals elaborated on the *Rufo* standard as follows:

> Modification may be considered when (1) a significant change in facts or law warrants change and the proposed modification is suitably tailored to the change, (2) significant time has passed and the objectives of the original agreement have not been met, (3) continuance is no longer warranted, or (4) a continuation would be inequitable and each side has legitimate interests to be considered.

*Id.* at 1582 (citing *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 391, 112 S.Ct. 748, 764, 116 L.Ed.2d 867 (1992); *Newman v. Graddick,* 740 F.2d 1513, 1520 (11th Cir. 1984)).

Application of the three additional *Jacksonville* factors to the instant case does not alter the court's analysis. The Board's petition to amend the consent decree was filed less than two years after entry of the consent decree. Thus, a significant amount of time has not passed since entry of the consent decree. Cf. *United States v. United Shoe Machinery Corp.,* 391 U.S. 244, 88 S.Ct. 1496, 1501, 20 L.Ed.2d 562 (1968) (modification permissible where consent decree has not achieved its purposes after 10 years of operation). Because the Board has not achieved unitary status, the court cannot conclude that continuance of the consent decree is no longer warranted. Finally, as discussed *infra,* the court does not find that continuance of the decree would be inequitable.

53. Thus, the Court explained,

> If it is clear that a party anticipated changing conditions that would make performance of the decree more onerous but nevertheless agreed to the decree, that party would have to satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b).

*Id.* at 385, 112 S.Ct. at 760–61, 116 L.Ed.2d 867 (citations omitted).

The Board has also failed to show that unforeseen obstacles have rendered the consent decree unworkable. The Board argues that when it developed Plan 2000 and thereby committed to building a kindergarten-through-twelfth-grade school for Autaugaville, it did not consider the quality of education it would be able to provide to the students, but only the physical facilities. The Board thus argues that it did not foresee that it would be difficult to provide equivalent curricular offerings to the students at the smaller schools like Autaugaville as to its students at Prattville. The court finds this argument unpersuasive and not entirely credible—after all, the Board's main duty at all times is provide a quality education for its students. It is a reasonable assumption that educational quality was in mind when the Board undertook major building plans. Nevertheless, even assuming that the Board did not consider educational quality when it originally sought approval of Plan 2000, its commitment to building a K–12 school for Autaugaville was reaffirmed and reinforced in the June 1997 consent decree, which stated that all prior orders would remain in effect and further commanded the Board to take steps to develop a magnet school in the Autaugaville K–12 school.

The Board also argues that academic quality at Autaugaville was not an issue of concern when the 1997 consent order was negotiated, and that, as a result, the difficulty of providing educational equity in Autaugaville was not foreseen at that time either. The court cannot accept this argument. The impetus for negotiating the consent degree was to resolve the Board's petition for a finding of unitary status, that is, a finding that the Board had eliminated, to the extent practicable, the vestiges of the racially dual school system. The whole purpose of the consent decree was to develop a procedure by which the Board could arrive at unitary status and improve the quality of education for Autaugaville students in Autaugaville. Therefore, the

parties must have foreseen the difficulty of providing the same courses to students at Autaugaville. Dr. Bell, the desegregation expert for the United States, pointed out the difficulty of educating students in the Autaugaville schools in his 1996 report on the Autauga County school system.[54] Thus the United States cannot claim that it did not foresee these issues when it joined in the 1997 consent decree. Furthermore, the Board necessarily knew that Autaugaville High School had and would continue to have a small student population when it sought approval of Plan 2000 and when it entered the consent decree settling its petition for declaration of unitary status, and also knew that the size of the student population in the school would limit the curricular options available to the students. Therefore, the Board has not demonstrated that unforeseen obstacles justify modification of the consent decree.

Neither has the Board demonstrated that the consent decree, as written, is unworkable. While the Board has shown that curricular options available to students at Autaugaville cannot be equivalent to those available to students at Prattville without additional students, the consent decree does not require total equivalency. It requires that the Board provide curricular offerings equivalent to those in Prattville only to the extent that is possible given the size of the Autaugaville student body.

Finally, the Board has not proven that implementation of its plan would be in the public interest. There is significant evidence that the Autaugaville students and community may be harmed as a result of the transfer to Prattville High School. The students will have to spend additional time on buses. The community will lose an institution that has been a source of pride and spirit. Furthermore, the closing of the school will communicate to the town, once again, that its wishes are not viewed as important as those of White parents and students.

54. J.S., ex. 2.

The African–American students may also be harmed. There is some evidence of tensions between the students of the different schools, and one father testified that he feared for the safety of his son should he be transferred to Prattville. Although the Board has developed plans for easing the transition of the students into Prattville High School, it has been documented that African–American students are severely over-represented in special-education classes and under-represented in gifted and talented classes in Prattville High School. This evidence, although far from conclusive proof that the Autaugaville students will fare poorly at Prattville High School, gives the court concern. Prattville is also a much larger school in which Autaugaville students likely will lose some of the individualized attention they now receive at Autaugaville, and may lose their class standing. There is also unchallenged evidence in the record that there were no African–American students on the golf or tennis teams at Prattville High School, and that the absence of minority team-members was likely due at least in part to the racially exclusionary practices of the private practice facilities used by the teams. The 1997 consent decree attempts to address this problem by committing the Board to eliminating systemic barriers to participation in extracurricular activities and to encouraging minority participation in all extracurricular activities. However, the evidence presented to the court leaves unclear the extent to which the Board has succeeded in remedying this problem.

In any event, the manner in which Autaugaville students will benefit from the proposed transfer remain unclear. While it is indisputable that such students will have a broader range of classes and extracurricular activities from which to choose and exposure to a more diverse student population, the Board has not presented persuasive evidence that the students' academic performance is likely to improve as a result of these factors. Evidence that

the average test scores of students at Prattville are significantly better than the test scores at Autaugaville is misleading, because such scores were not broken down. It is entirely possible that the African–American students at Prattville High School suffer from the same academic performance maladies as the students at Autaugaville High School, but that their poor performance is masked by the averaged scores. In light of the widely discussed performance gap between African–American and White students on standardized tests, the court is unwilling to assume that the averaged scores for test performance at Prattville High School are probative of the performance of African–American students at that school. Without any reliable evidence regarding the test performance of African–American students in Prattville High School, the court is unable to conclude that the Autaugaville students' likelihood of academic success will improve in Prattville.

The Board has presented testimony that a higher percentage of African–American seniors graduated one year at Prattville High School (57 of 62 students) than at Autaugaville High School (24 of 31 students).[55] Graduation does indicate a certain level of educational success, and a school with a higher rate of graduates is undoubtedly more successful in terms of that particular outcome. However, the court hesitates to make too much of this evidence because it is unclear what is entailed in graduating and what distinguishes those who receive a diploma from those who do not. Does one need a certain grade point average in certain courses to graduate? Moreover, many of the underlying reasons for dropping out of school are likely external to both Autaugaville and Prattville high schools and affect students regardless of where they attend school.[56] Given the uncertain meaning of the graduation rate in terms of academic performance, the fact that it was measured

---

55. Murchison testimony at 164–69.

56. Examples of such reasons for dropping out of school include pregnancy, problems in the home, and poverty.

in only one year, and that the minority student population at Prattville High School likely includes an atypical, academically motivated, "self-selected" group of Autaugaville students who chose to attend Prattville High School, this evidence does not convince the court that the African–American students of Autaugaville will necessarily succeed academically at Prattville High School.

Finally, as an alternative approach, the United States and the Board argue that the plan complies with the spirit, if not the letter, of the consent decree. Part of this argument depends on the Board's proposal to build two magnet schools in Autaugaville in the future. The United States also has argued convincingly and presented evidence to show that the establishment of magnet programs for grades four through twelve in Autaugaville could be an effective means to desegregate the Autaugaville schools. However, the plan submitted to the court does not commit the Board to build a high-school magnet program for grades nine through twelve, but instead discusses the mere possibility of building such a school should funding and population growth allow it. Perhaps had the Board committed to building a magnet high school in Autaugaville, on a specific piece of land, at a specific time, the court could consider the high school as part of the Board's proposal. Nevertheless, the court cannot treat a mere unenforceable possibility as a definite part of the proposal. Without it, the proposal does not comply with the spirit of the consent decree because there is a distinct possibility that

there will never be another high school in Autaugaville.[57]

The court is aware of the Board's continuing duty to strive for desegregation and unitary status. *See Pitts v. Freeman,* 755 F.2d 1423, 1427 (11th Cir.1985). The court also is impressed by the Board's clear desire to better the education of the students of Autaugaville. Nevertheless, the African–American community should not alone shoulder the burdens of desegregation. *Arvizu v. Waco Indep. School District,* 495 F.2d 499, 504–05 (5th Cir. 1974); *Lee v. Macon County Bd. of Educ.,* 448 F.2d 746, 754 (5th Cir.1971).[58] Under the Board's proposed plan, that is precisely where the burden falls in this case.[59]

The Board must continue to strive to desegregate the Autauga County schools and to alleviate the effects and stigma of past segregation. The Board should continue to explore other options including the establishment of magnet school programs in Autaugaville and the institution of remedial programs to help the Autaugaville students overcome educational deficits.

The court will continue to monitor the progress of the students at the new Autaugaville school. Should the students fail to improve after having the opportunity to attend the new school, the Board can again petition to transfer the students to Prattville High School or propose an alternative plan, such as, for example, consolidating the high-school populations of Autaugaville, Billingsley, and Marbury in a new, centrally located school, constructing a new magnet high school in Autaugaville, or

---

**57.** The court finds entirely credible the testimony of Superintendent Murchison indicating that she fully intends to see to the building of a magnet high school in the vicinity of Autaugaville within the next five years. However, as any student of public affairs knows, the best intentions of government officials can mean very little for a variety of reasons, including circumstances outside of the officials' control. Therefore, Superintendent Murchison's best intentions cannot be substituted for a legally enforceable promise to build a high school.

**58.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

**59.** When burdens fall disproportionately on AfricanAmericans, the defendant has a "heavy burden" of justifying its decision. *Arvizu,* 495 F.2d at 505. However, because the court decides the case on other grounds, it will not now undertake an analysis of whether the Board has met this burden.

renovating the old Autaugaville Elementary School and transferring the elementary school students back from the new school.[60]

The students of Autaugaville have never had the opportunity to attend a school with adequate physical facilities in their own town. That opportunity, so close at hand now, will not be foreclosed. The effects of poor facilities, and of the message conveyed to minority students by the Board's allowance thereof, are immeasurable. The faculty and families of Autaugaville deserve a chance to educate their students in facilities truly equal to those of Autauga County's White majority. The court believes this is a chance worth taking.

---

60. The record indicates that the elementary school is still in existence, *see* Murchison testimony at 171, and that Dr. Bell concluded in his 1996 report that, "even though in dire need of repair, the two Autaugaville schools could have been converted to magnet schools." J.S., ex. 2 at 8. Presumably, the elementary school still could be so converted, thereby allowing a larger number of secondary-school students to attend the new Autaugaville school.