UNITED STATES of America,
Plaintiff,

v.

SOUTH FLORIDA WATER MAN-
AGEMENT DISTRICT, et al.,
Defendant.

No. 88–1886 CIV MORENO.

United States District Court,
S.D. Florida,
Miami Division.

June 14, 2005.

Keith E. Saxe, Washington, DC, for the United States.

Dexter Lehtinen, Miami, FL, for the Miccosukee Tribe of Indians of Florida, Counsel for Plaintiff.

Kirk L. Burns, Miami, FL, for the South Florida Water Management District.

Charles DeMonaco for the Florida Department of Environmental Protection, Counsel for Defendant.

*ORDER REQUIRING SPECIAL MASTER TO HOLD A HEARING ON THE ISSUE OF REMEDIES AND SUBMIT A REPORT TO THE COURT*

MORENO, District Judge.

This case involves an agreement among the United States, the South Florida Water Management District and the State of Florida Department of Environmental Protection. The original action filed in 1988 by the United States involved claims relating to pollution in the form of phosphorus accumulations in the Florida Everglades and Loxahatchee National Wildlife Refuge caused by the agricultural production in the areas surrounding the Everglades. In 1991, the parties entered into a settlement agreement, which was incorporated as a consent decree. At issue is whether the settling parties have complied with their self-imposed deadlines. The Court finds that they have not and therefore grants the Miccosukee Tribe of Indians' Motion for Declaration of Violation in the Loxahatchee National Refuge (D.E. No. 1822). The Court concludes that there is a violation of the consent decree due to exceedances that have occurred at the Loxahatchee National Wildlife Refuge.

In making this finding the Court recognizes that the goal of the settlement agreement is complex, requiring a long period of time for execution and huge expenditures to correct past pollution caused long before the present federal and state administrations. The Court is also mindful that any cleanup project involves not only the settling Florida agencies but also cooperation from the United States Army Corps of Engineers and other agencies. The Court suspects, as in any contract that is the subject of litigation, that the parties would have improved its drafting. Yet, this Court, as with any federal court, does not have the authority to redraft the contract entered into by the parties irrespective of the good faith shown by any of the parties involved. It can, however, fashion a remedy if the consent decree has been violated. Simply put, the admitted phosphorus exceedances are not due to error or extraordinary phenomena. Therefore, based upon the language of the agreement, there is evidence of a violation of the consent decree. The Court is thus left with the task of deciding what is the appropriate remedy for such violation.

## BACKGROUND

In 1991, the Miccosukee Tribe entered into a Memorandum of Agreement with the United States, where the Tribe agreed to the terms of the original agreement entered into by the state and federal parties.[1] Thereafter the Tribe filed a motion for intervention rights for the limited "purpose of permitting the Tribe to invoke this court's continuing jurisdiction... to enforce the settlement agreement ... as may be necessary to protect the rights and interest of the Tribe." In 1992, the judge presiding over the case, Judge Hoeveler, granted the Tribe's motion,[2] approved the Settling Parties' agreement, and retained jurisdiction over it. Through the Court's

---

1. Instead of pursuing its own claims against the State of Florida agencies, the "Tribe accepted the terms of the Settlement Agreement as establishing appropriate deadlines and commitments for the restoration of the Everglades." *See* Tribe's Motion Concerning STA 3/4, p. 5.

2. As for any standing issues raised by the Sugar Industry, the Court agrees with the United States' position that the Sugar Industry does not have standing to raise the standing issue of the Tribe. For the reasons previously stated by this Court, consistent with prior rulings by this Court's predecessor Judge Hoeveler and also consistent with the announced position of the United States, the Court again reiterates its prior ruling finding that the Tribe has standing.

approval of the agreement, the agreement was converted to a consent decree. The conversion of the agreement into a consent decree allows the Court to use its broad powers to ensure that the parties comply with specific provisions of the agreement entered into by them.

Years later, the settling parties agreed that the original agreement should be modified and requested that the consent decree be modified. This request included extension of the deadlines for reaching certain interim phosphorus levels. It also included an extension for compliance with long-term phosphorus levels from July 1, 2002 to December 31, 2006. Thus, an additional four and one half years was requested with respect to the long-term levels. The Tribe opposed the modification of the consent decree and instead sought to have the original agreement enforced. On April 27, 2001, Judge Hoeveler approved the proposed modifications and modified the consent decree. At that time he opined, "any analysis about enforcing the original Consent Decree at this point in time-after many of the original deadlines have lapsed and after enactment of state legislation that contains more permissive deadlines and, in some instances, more comprehensive relief-might be unnecessary if the Court retroactively accepts the Settling Parties proposed extensions in the modified Settlement Agreement." Judge Hoeveler imposed "a process rather than a result, in effect recognizing an administrative framework while preserving this Court's ultimate jurisdiction."

The Modified Agreement/Decree requires that the water be sampled at 14 separate sampling points located throughout the Loxahatchee National Wildlife Refuge.[3] The monitoring and sampling of the water must be performed on an ongoing

basis since phosphorus is a necessary bi-product of sugar production. The agreement contains both interim and long-term phosphorus concentration level goals, which are to be achieved through various measures. The monthly expected phosphorus concentration levels are based on historical figures and vary from month-to-month to account for certain natural variables, such as changes in water levels and temperatures. The long-term levels are the same levels that must be met under the Everglades Forever Act enacted by the State of Florida. Fla. Stat. § 373.4592. The long-term levels are more stringent than the interim levels, but they do not go into effect until December 31, 2006.

The Modified Agreement/Decree also calls for the construction of various structures known as storm-water treatment areas ("STAs") and the implementation of certain farming techniques or Best Management Practices ("BMPs"). The STAs are designed to treat large amounts of water to decrease the amount of phosphorus in the water and in the Everglades area. In total there are six STAs, currently comprising approximately 41,000 acres. The lands contain certain plants or vegetation that help decrease the amount of phosphorus. The water from farm run-off is directed through these areas so that much of the phosphorus is removed prior to the water being discharged into the Refuge or Florida Everglades Park. The BMPs are designed to ensure that once a technique is found to reduce the amount of phosphorus levels, such technique is used quickly and broadly while maintaining agricultural productivity. The agreement sets the deadlines for completion of each of the six STAs.

---

**3.** The Court notes that much of the time samples were not collected from each of the 14

sampling points.

From 1999 through 2003, the sampling data showed that the interim levels were not always being achieved. Thereafter, the Miccosukee Tribe sought to intervene in the case once again. The Tribe sent a letter to the United States asking it to seek mediation on the issue of phosphorous exceedances at Loxahatchee National Wildlife Refuge and the issue of the operation of STA 3/4. The United States did not seek mediation. Thereafter, the Tribe sought judicial redress of these issues through the filing of the motions before this Court. The Tribe seeks to have this Court declare that there have been violations of the Modified Agreement/Decree. In essence, the Court is asked to ensure that the parties are complying with the previously entered into, and modified, agreement. There is no claim by the Tribe that the Settling Parties have intentionally or maliciously failed to comply with the terms of the agreement.[4] In fact, the Court recognizes that the South Florida Water Management District indicates that it has spent approximately $200 million to build STA 3/4, which became operational after the expected date of October 2003 because of a contractor's bankruptcy. The Court also takes note that STA 3/4 alone is over 16,000 acres, three times as large as the other storm-water treatment areas. Hence, the scale of the effort undertaken is monumental and complicated, and the effort to clean up the environment by Florida's leaders is commendable.

## A. PROOF OF A VIOLATION BASED ON EXCEEDANCES

In its first motion, the Tribe claims that there is a violation of the consent decree due to phosphorous exceedances that have occurred in the Loxahatchee National Wildlife Refuge. To decide whether there is a violation, the Court must look to the language of the agreement entered into by the parties and the evidence presented to support each party's respective position.

The agreement calls for the computation of a monthly geometric mean based on the 14 samples taken from various locations throughout the Refuge. The agreement also sets various phosphorus levels or geometric means that are to be obtained each month. Currently, the agreement calls for the achievement of what are known as interim levels. In late December 2006, the more stringent long-term phosphorus level goals take effect. But for now, the issue is only whether the more modest interim levels were met. If those levels are not achieved, then the question is whether by not achieving the previously agreed upon and modified lower phosphorus levels there is a breach of the agreement.

On December 13, 2004 this Court held a hearing to consider evidence on the limited issue of whether exceedances of interim concentration levels at the Refuge had occurred and, if so, the appropriate remedies for such exceedances (D.E. No. 1891). Thereafter, the Court allowed the parties to present written pleadings on the exceedance and remedies issues. On March 17, 2005 the Court then heard oral arguments on the remedy issue. Following that hearing, the Court had the Special Master file a report with the Court.[5] On May 17,

4. Although the settling parties have spent considerable resources in attempting to meet the interim levels, they acknowledge that the levels are not being met and that additional measures need to be taken to ensure that the levels are met in the future. Additional measures will more than likely require additional funds, something that is beyond the Court's power. Although the Court does not address the remedy issue at this time, common sense dictates that the sooner the additional remedies are implemented, the more likely it is that lower phosphorus levels will be continuously achieved. That is, of course, the primary purpose of the agreement entered into by the settling parties. Hopefully, lower phosphorus levels will result in a decrease in litigation costs.

5. Although the report of the Special Master is not evidence, because the Special Master has

2005, the Court held another hearing where the issues raised in the Special Master's report were discussed. The Court also allowed the parties to file any written objections to the Special Master's report.[6] The Court has considered the evidence presented at the evidentiary hearing, the written pleadings, the report, written responses to the report, and all written and oral arguments.

The agreement states that there is an "exceedance" if the actual monthly geometric means are greater than the interim levels "two or more times in any 12 consecutive sample collections." Consent Decree, App. B, p. B–5. Thus, this Court must decide the factual question of whether the geometric mean was greater than the interim levels two or more times in any 12 consecutive sampling periods. Each time that occurs, there is one exceedance.

At the evidentiary hearing from December 13–14, 2004 the Tribe presented substantial and convincing evidence that based on the sampling performed by the settling parties, an exceedance in the interim levels occurred each year since 1999. Specifically, the geometric mean was greater than the interim levels in November 1999, October 2000, October 2001 and July 2002. There is also a possible violation because the geometric mean was greater than the interim levels in September 2003 and August 2004. In each of these situations, the geometric mean was greater than the interim levels two or more times in 12 consecutive sampling periods. Therefore, there were at least three exceedances and possibly another, consistent with the con-

clusions from Drs. Walker and Kadlec regarding phosphorus levels.

■ At a July 24, 2003 meeting, the Technical Oversight Committee ("TOC") considered these same issues. The TOC is a body of experts created by the settling parties through the language of the agreement. Paragraph 18 of the consent decree requires the TOC to plan, review and recommend all research, monitoring and compliance with the terms of the agreement. The members of the TOC are appointed and employed by the settling parties.[7] That group of appointed experts concluded that "Interim Levels have been exceeded one or more times in each of the four years since they went into effect" in 1999. *See* Tribe's Motion Ex. B. Additionally, at the May 11, 2005 hearing, the settling parties admitted that exceedances did in fact occur. Based on all of this evidence, the Court has no alternative but to find that there were multiple exceedances occurring approximately once each year since 1999.

■ The next issue is whether each of those exceedances constitutes a violation of the consent decree. To resolve that issue, the Court must again look to the language of the agreement entered into by the settling parties and the evidence presented at the December 2004 hearing. The relevant language states: "An exceedance will constitute a violation of this Agreement and relevant water criteria unless the TOC determines there is substantial evidence that it [the exceedence] is due to error or extraordinary natural phenomena." Consent Decree, App. B, p. B–5. Thus, it is clear by this language of the agreement

---

been involved in numerous aspects of this case and is intimately familiar with all the facts of this case, his unbiased opinion assists the Court in focusing on the issues presented.

**6.** The State Parties and the Farm Interests filed written responses to the Special Master's Report.

**7.** The United States acknowledged that the TOC has held meetings but that it is not likely to act unless forced to do so. The settling parties also acknowledge that they are in the best position to ensure that the TOC fulfills its obligations, which go beyond meeting and deciding when to meet again.

that, unless the TOC determines that there is substantial evidence to show that the exceedance was caused by error or extraordinary phenomena, then the Court can find a violation of the consent decree. At the July 24, 2003 meeting, the TOC considered the issue of error or extraordinary phenomena. The TOC stated, "[it] could not reach a consensus that the exceedances were due to error or due to extraordinary phenomena."[8] Tribe Motion Ex. B. Since the TOC did not determine that there was substantial evidence to show that the exceedances were excusable, the Court is free to find that the Tribe has shown that each exceedance constituted a violation of the consent decree.

Although the settling parties had agreed that the TOC would decide whether an exceedance was excusable, it is clear that those appointed experts could not reach a consensus on that issue, and this Court has to decide whether such exceedances were caused by error or extraordinary phenomena. At the December 13–14, 2004 hearings the Court heard the evidence on the issue of error and extraordinary phenomena and arguments on the issue of what can be considered an "extraordinary phenomena." The Court finds that the settling parties have failed to present substantial evidence to show that the exceedances were excusable.[9] Although the Court finds that the settling parties have failed to show that the exceedances were caused by error or extraordinary phenomena, the Court has not delved into the range of possible causes of the exceedances.[10] As outlined more fully below, the Special Master can consider the issue of causation in making his Report on remedies. After such Report and Recommendation, the Court can then, if appropriate, reconsider its ruling that there has been a violation of the consent decree.

## B. PROOF OF A VIOLATION CONCERNING STA 3/4 DEADLINE

On March 31, 2004 the Tribe also filed a motion for a declaration that the settling parties breached the Modified Agreement based on the fact that STA 3/4 was not operational by the deadline set forth in the Modified Agreement/Decree. This dispute involves the determination of what the parties meant by the use of the term "operational" in the Modified Agreement. It is a legal question calling for the interpretation of the Modified Agreement/Decree. The Court has been fully briefed on this purely legal issue.

■ On December 6, 2004, at the recommendation of the Special Master, the

---

8. A consensus calls for agreement by 4 of the 5 members of the TOC.

9. The Court also finds that the argument that the exceedances are sampling errors or false-positive readings is without merit. The State and Farm Interest Parties argue that the exceedances are errors which lack statistical significance. However, this type of "error" is a deviation that would have necessarily been contemplated by the parties and included into the terms of the agreement. The agreement allows for exceedances, but it does not allow for two exceedances in a 12 month period. In fact, the false-positive argument is inconsistent with the Parties' representations that the Long–Term levels will be met. The error referred to in the agreement is more likely an error relating to proper sampling.

Lastly, the 1978 and 1979 values are not controlling, but instead it is the interim and long-term levels set by the parties in the agreement that must be met. The language is clear as to what an exceedance is and the Court need not examine any extraneous evidence.

10. The Court does not need to decide the actual cause of the exceedances in order to find that the settling parties have failed to present substantial evidence that the exceedances were caused by extraordinary phenomena.

settling parties filed a related Joint Motion to Amend the Consent Decree Deadlines for STA 3/4, to which the Tribe has objected. The settling parties' proposed amendments attempt to modify the Modified Consent Decree by extending the deadlines relating to STA 3/4, but without admitting fault or liability.[11] This is the position taken by the Settling Parties at the May 11, 2005 hearing before this Court.[12] The Tribe objects because it seeks an admission that the deadlines were not met (i.e., that there was a violation) and because it believes that a *Rufo*[13] hearing is necessary on the issue of whether the prerequisites have been met, which would then allow the Court to modify the Modified Consent Decree. The Court believes that if a *Rufo* hearing is necessary, then it should be conducted by the Special Master.[14]

Based on the representation made at the May 11, 2005 hearing, STA 3/4 is currently able to be operated. Rather than spending considerable resources on the issue of whether the consent decree should be modified with respect to the STA 3/4 deadlines, it is more prudent to simply deny the request to Amend the Consent Decree Deadlines for STA 3/4. There are numerous reasons to support this decision. First, it is possible that the issue will be moot as STA 3/4 may be able to be operated.[15] Second, the consent decree was already modified once. Third, the already Modified Consent Decree may need to be modified again once the Court determines the proper remedy. Those modifications will depend on whether the Tribe and settling parties can reach a consensus on the proper *reasonable, specific and detailed* remedies necessary or, alternatively, when the Court decides the proper remedies following a Report from the Special Master. Multiple modifications to the consent decree will only result in delays and confusion.

Lastly, and possibly more significantly, instead of simply defining the terms and setting new dates, the proposed amendments to the Modified Consent Decree actually inject more confusing terms into the

---

11. Paragraph 9 of the Joint Motion to Amend states that the Settling Parties do not admit fault or liability. In paragraph 8, however, the Settling Parties acknowledge that the Joint Motion includes a request to alter the parties' obligations under the agreement. Yet the Joint Motion to Amend the Consent Decree would be unnecessary if obligations among the parties were not being changed.

12. The Department of Environmental Protection argues that the motion to amend the consent decree deadline for STA 3/4 should be granted, even though in the same breath it argues that the STA 3/4 deadline was met as required by the agreement. Based on this argument, the Court should deny the motion as moot; yet, the Department urged the Court not to take such action.

13. A *Rufo* hearing is where the Court hears evidence on whether modification of a consent decree is appropriate. *See Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) (allow-

ing the Court to modify a consent decree pursuant to Fed.R.Civ.P. 60(b) to permit double bunking of prisoners while a jail was being constructed).

14. It seems highly likely to this Court that, if a *Rufo* hearing were held, the settling parties would need to explain why it is necessary to modify the consent decree to change the dates or deadlines for STA 3/4. The settling parties argue that bankruptcy and permit restrictions were unforeseeable events, which justify the modification. The Court finds little merit in such arguments. Moreover, implicit in the settling parties position is an admission that the deadlines were not met. Otherwise, there would be no reason to try to justify the proposed modifications through the use of the bankruptcy of the engineering firm.

15. All of the revised dates listed in the Joint Motion to Amend the Consent Decree Deadlines for STA 3/4 are historical dates which occurred prior to the date of the filing of the December 6, 2004 motion.

consent decree, such as "commencement of start-up operations," without defining the terms "operational" and "construction," which have been contested issues in this case.[16] Thus, the Joint Motion to Amend the Consent Decree Deadlines for STA 3/4 is DENIED without prejudice to refile after a *Rufo* hearing is conducted by the Special Master.

Instead of amending the consent decree, the Court will address the purely legal issue of what the parties intended when they stated that the "construction" and "operational" date for STA 3/4 is October 1, 2003. According to the Tribe, STA 3/4 was to be in full operational mode, that is, actually fully functioning and water flowing through the entire STA, by October 1, 2003. In its response to the Tribe's Motion, the United States argues that the deadlines have not been met but that the parties are "making a good faith effort to achieve flow through operation of STA 3/4 as soon as practicable." The state parties take the position that the terms "construction" and "operational" mean that the STA is built, but not necessarily operating as intended. The state parties argue that the water could not be discharged from STA 3/4 due to the high concentration of phosphorus inside STA 3/4 and building permit restrictions. It argues that STA 3/4 was fully capable of being operational as of December 2003.[17]

After reading the entire agreement and keeping the purpose of the agreement in mind, which is to decrease phosphorus levels, the Court concludes that the parties intended that STA 3/4 be *operating*. When it is not *operating*, it is not performing the sole function for which it was created, that is, to decrease the amount of phosphorus in the water in the Everglades.[18] Thus, there is evidence of a violation of the consent decree based on the failure to timely construct STA 3/4.

At the same time, the Court commends the state parties for their initiative in implementing enhancements to the STAs, including technology that shifts from emerged cattail vegetation to submerged aquatic vegetation, enhanced monitoring of water quality, and feasibility studies to examine the benefits of expanding storm water treatment areas. Because of that, the Court considers the non-compliance with the construction deadline to be a relatively minor violation. The main issue is the uncontested fact that exceedances have occurred. If there had been no exceedances, this would likely be a non-issue. The Court does not decide whether the exceedances may have been caused, in part, by the failure to ensure that STA 3/4 was operating as contemplated and by the deadlines previously agreed upon by the settling parties.[19] The STAs are, of

---

**16.** The Court notes that this issue is likely to arise again with respect to the newly proposed additional STAs.

**17.** This date does not seem consistent with the dates listed in the Joint Motion to Amend the Consent Decree. Although the Court notes that modifications were being made to STA 3/4 and the Court applauds any efforts by the State to provide the best STAs possible, if it is going to voluntarily accept such additional responsibilities and those responsibilities require more time, then the parties should propose those modifications to the Court. Otherwise, the parties must comply with the

time parameters set forth in their own agreement.

**18.** Taking the settling parties' arguments on the exceedances and operational issues to their logical extremes would mean that they could construct all STAs so that they were non-functioning and have numerous exceedances without any judicial redress.

**19.** Although in his April 27, 2001 order Judge Hoeveler found that STA 3/4 could not be operational any sooner than October 1, 2003, he noted the Conservation Intervenors' position that the sooner that STA 3/4 is completed the more likely it is that the parties can com-

course, designed for the purpose of decreasing phosphorus levels. In fact, as stated by the Settling Parties at the May 11, 2005 hearing, STAs are the primary method of decreasing the concentration level of phosphorus in the water in the Everglades. As indicated, STA 3/4 is by far the largest storm-water treatment area, comprising 16,660 acres of the total 40,542 acres of STAs. At this juncture, *all* parties need to focus on implementing specific remedies to achieve the interim and long term goals.

The settling parties have proffered to the Court that STA 3/4 is now constructed, operational and capable of being operated. Proof of this must be presented to the Special Master. Proof must also be presented as to why the largest STA is not fully operat*ing*, especially in light of the fact that the settling parties have acknowledged the need for approximately 18,000 acres of additional STAs. As set forth below, the Special Master can file a report with this Court on whether any remedy is necessary if STA 3/4 is actually operating in full capacity.

## C. REMEDY FOR THE VIOLATIONS OF THE CONSENT DECREE

■ By filing the settlement agreement with this Court back in 1991, the parties asked the Court to ensure that they complied with the terms of the agreement. "A consent decree is, after all, a judgment and is entitled to a presumption of finality." *Delaware Valley Citizens' Council for Clean Air v. Commonwealth of Pennsylvania,* 674 F.2d 976, 981 (3d Cir.1982), *cert. denied,* 459 U.S. 905, 103 S.Ct. 206, 74

L.Ed.2d 165 (1982). It is the Court's duty to determine the terms of the parties' agreement and whether the promises made to each other and to the people of Florida have been honored. Only after such determination does the Court have the inherent authority to modify a consent decree in the interests of justice or equity. *John Simmons Co. v. Grier Bros. Co.,* 258 U.S. 82, 42 S.Ct. 196, 66 L.Ed. 475 (1922). Any remedy imposed by the Court, however, should be narrowly tailored to address the violations and made with the Court's understanding of its limited power as the third branch.

The Miccosukee Tribe's proposed remedies are substantial and far reaching. On the other hand, the settling parties argue that the remedy issue is moot since the settling parties have already begun implementation of corrective actions.[20] In essence, the settling parties' position is that, even if there is a violation, there is no need for a remedy since the agreement states that, after a violation, the parties are to implement procedures to ensure that exceedances do not recur, and they have implemented such procedures as required by the agreement. Therefore, they argue that there is no need for this Court to impose any mandatory remedy.

A consent decree has the force of law. The issue cannot be moot unless there are some binding requirements. To suggest that a remedy is "in the works," does not render the issue moot. Moreover, a proposed non-binding "remedy," or one where the parties are not obligated by the consent decree to perform, is no remedy at

---

ply with the terms of the agreement, that is, the more likely the levels can be achieved. (D.E. 1623 at p. 21). Moreover, in their response to the Special Master's Report, the State Parties are of the opinion that the recent completion of STA 3/4 and the future full operation of STA–1E should help reduce phosphorus levels.

**20.** It is the Court's hope that the Tribe and the parties are able to compromise and meet somewhere in the middle of these two proposals, especially since the Tribe's primary concern was the finding of a violation in hopes that more funding would be appropriated by the federal and state legislatures.

all. For example, the District's first, and presumably most significant, proposed "remed[y] requires completion of the phosphorus control program described in the Settlement Agreement." (D.E. No.1907, p. 20). Yet, this cannot be a proposed remedy for the past violations since it is nothing more than what the District is already obligated to do under the consent decree. The state department also proposes to comply with state water quality standards by December 2006. Although at first glance this is commendable, it is equally void of any further commitment since the December 2006 levels are already part of the long-term levels set forth in the agreement.[21] Essentially, the District is stating "all is well" and nothing more needs to be done except further meetings and studies. If the state agencies propose actual *additional* and *specific* remedies, the Special Master may consider those remedies as he determines what to recommend as a result of the violations of the consent decree already found by the Court. This Court's power to enforce the consent decree is not limited to vague remedial proposals, most of which the State agencies are already bound to do, as per the consent decree.

Moreover, without *specific details* of what that remedy will be, the Court is not able to ensure that the Parties comply with the remedial measures. This Court cannot enforce vague assertions about what will be done in the future, or what might be done based on certain other conditions first occurring. There must be *specific acts* to be performed and *specific dates* by when those acts must be completed. That will ensure that everyone involved knows exactly what must be done and when it must be done. Such course of conduct increases the chances that more will be done sooner to ensure that the levels are met and that no further exceedances or other violations occur.

The Special Master shall hold a hearing within 90 days of this order on the issue of remedies and, if necessary, on causation. The hearing shall be recorded and transcribed and the Federal Rules of Evidence will apply. Within 60 days of the hearing, the Special Master shall file a recommendation with the Court reporting the issues on which the Tribe and parties agree, the issues in dispute, and the proper remedies that best address the violations listed by this Court. The remedies must require a party to act in some definite manner. The Report of the Special Master should include, but not be limited to, the following subjects:

(1) Whether strict compliance with sampling requirements is possible?

(2) Whether strict compliance with sampling requirements is necessary to determine the effect of diversion of water and to ensure that monthly data is most reflective of the level of phosphorus in the water so progress can be evaluated?

(3) What can be done to ensure that Storm-water Treatment Area 1E is fully operational as soon as possible?

(4) By what date can Storm-water Treatment Area 1E be fully operating?

(5) By what date are the CERP[22] projects to be completed and can those projects be completed sooner?

---

**21.** The same holds true for the District's proposed "adaptive-management" and its refusal to be bound to implement Acceler8. Acceler8 is a project in which the State and the Army Corps of Engineers work together to implement a number of initiatives, including increasing the number of Stormwater Treatment Areas and CERP projects.

**22.** CERP projects are other projects, besides the additional STAs, undertaken by the state agencies and the Army Corps of Engineers, which include diversion of water from one STA to another.

(6) Is it possible to complete the Acceler8 project at an earlier date?

(7) When can all 16,660 acres of Storm Water Treatment Area 3/4 be fully operational, with completed enhancements?

(8) What are the dates for acquisition, construction, and full operation of the approximately 18,000 more acres of additional Storm-water Treatment Areas proposed by the settling parties?

(9) What are the earliest, and latest, dates by when a large scale PSTA[23] study can be conducted by the Army Corps of Engineers?[24]

(10) What should the role of the TOC be (i.e. should it include other duties)?[25]

(11) Whether monthly TOC meetings might help improve TOC responsiveness?

(12) Will the Feasibility Study be completed by November 2005?

Apart from this evidentiary hearing, if the Special Master feels he can also perform the role of mediator with the consent of the parties, he is free to perform that function.

In conclusion, in finding a violation of the consent decree, the Court is merely ordering at this time that the United States and the state agencies implement their own remedies but provide more detail and a schedule that *will* be met. In the absence of such, the Court, if appropriate and after the Report and Recommendation from the Special Master, may be compelled to impose its own additional specific and detailed remedies. The Court is confident that such judicial intervention will be unnecessary because the leaders of both the federal and state agencies have announced a commitment to preserving the Everglades.

**23.** PSTAs are Stormwater Treatment Areas which use periphyton to help further reduce phosphorus levels. To date, a large scale study on the effectiveness of PSTAs has yet to be completed.

**24.** At the May 11, 2005 hearing, the District stated that it did not understand why the Tribe is under the impression that PSTA is included in the feasibility study. At the May 11, 2005 hearing, the District stated that the models show that the December 31, 2006 levels *could* be achieved. Of course, the operative phrase *should* have been that the models show that levels *"will* be achieved." Instead of trying to aim low and performing the minimum required to hopefully reach the levels that were previously agreed upon and are now codified as law, the District should think about doing more now to prepare for the future. This is the same position taken by the

United States at the May 11, 2005 hearing when it claimed that the TOC should be more "forward looking" and "anticipate problems." Yet, the State Parties acknowledge that the members of the TOC, employed and controlled by the Settling Parties, are thus responsive to their respective employers. *See* State Response to Report p. 10. Considering the fact the deadlines have been modified once already and considering that those modified deadlines have been violated each year since modification, the members of the TOC, at the urging of the agencies that appointed them, should be more forward looking.

**25.** The United States acknowledged at the May 11, 2005 hearing that the TOC would be more responsive if it had pressure placed on it and that such pressure comes from the parties with whom the members of the TOC are employed.